# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1022
_____

United States of America, ex rel. Stephanie Strubbe; Carmen Trader; Richard
Christie, relators

*Plaintiffs - Appellants*

v.

Crawford County Memorial Hospital; Bill Bruce, Individually

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Northern District of Iowa - Sioux City
_____

Submitted: November 13, 2018
Filed: February 11, 2019
_____

Before BENTON, BEAM, and ERICKSON, Circuit Judges.
_____

BENTON, Circuit Judge.

Stephanie A. Strubbe, Carmen Trader, and Richard Christie sued Crawford
County Memorial Hospital (CCMH) as relators in a qui tam action for violations of
the False Claims Act. **31 U.S.C. § 3729(a)**. They also sued CCMH and its Chief
Executive Officer, Bill Bruce, for violating the FCA's anti-retaliation provision.

**§ 3730(h)**. The district court[1] granted CCMH's motion to dismiss all counts of the complaint, except Strubbe's retaliation claim. As for it, the district court granted CCMH's motion for summary judgment. *Strubbe v. Crawford Cty. Mem'l Hosp.*, 2017 WL 8792692 (N.D. Iowa Dec. 6, 2017). Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Crawford County Memorial Hospital is a county-owned nonprofit hospital in Iowa. In April 2012, Bruce became its Chief Executive Officer.

At CCMH, Strubbe was an Emergency Medical Technician (EMT), and Christie and Trader were paramedics. They filed a sealed qui tam complaint as relators in April 2015. The United States declined to intervene. The relators filed an amended complaint. It alleges that CCMH submitted false claims for Medicare reimbursement and made false statements or reports to get fraudulent claims paid. Specifically, Count I alleges that CCMH violated the FCA by submitting (1) claims for breathing treatments administered by paramedics; (2) claims for laboratory services done by paramedics and EMTs; (3) claims with false credentials of service providers; (4) claims for EMT and paramedic services at Eventide, L.L.C. and Denison Care Center; and (5) cost reports with improper reimbursements and payments to vendors for non-CCMH expenses. Count II alleges CCMH knowingly made or used false statements to get false claims paid, including (1) records documenting breathing treatments at 30 minutes; (2) records listing paramedics as "specialized ancillary staff" for breathing treatments; (3) reimbursement requests and invoices for improper payments for non-CCMH expenses; (4) documents with false credentials for emergency medical staff;

---

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

and (5) cost reports with false costs. Count III alleges that CCMH conspired with Eventide to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

Strubbe, Trader, and Christie also sued CCMH and Bruce for violating the FCA's anti-retaliation provision. According to the complaint, Strubbe began reviewing hospital financial documents in July 2014. Soon after, she "spoke to all Board members about the financial situation of CCMH [and] her belief that the finances were not adding up." In November, Strubbe tore her rotator cuff at work. Initially, CCMH put her on "light duty." In July 2015, however, CCMH told Strubbe her light-duty assignments were a financial hardship for the hospital and moved her to part-time status. CCMH removed Strubbe from part-time status in March 2016 (effectively a termination).

Christie and Trader also began investigating CCMH's finances in 2014. They complained to other hospital staff that "there was something wrong with the changes in the breathing treatments." Christie also complained there was "potentially something wrong with the financial statements provided by CCMH to the Board." In January 2015, Christie reported to her supervisor that Jonathan Richard was "not properly licensed" as a paramedic. Both Christie and Trader then reported the license violation to the Iowa Department of Public Health. Four months later, CCMH transitioned Christie from night shifts to day shifts. It terminated Christie later that month for speeding while driving an ambulance. Trader still works at CCMH as a paramedic, but claims that it subjects him to harrassment and other discriminatory treatment.

CCMH moved to dismiss the complaint. The district court dismissed the substantive FCA claims for failure to plead with particularity because the complaint did not set forth facts showing any false claims were submitted, or plead how the relators acquired this information. It also dismissed Christie and Trader's retaliation claims as not stating a plausible claim for relief. However, the court denied CCMH's

motion to dismiss Strubbe's retaliation claim. CCMH then moved for summary judgment on it. Concluding that Strubbe could not prove a prima facie case of retaliation, the district court granted summary judgment to CCMH.

II.

This court reviews de novo the district court's dismissal of a claim under Rule 9(b), "accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 555 (8th Cir. 2006). The False Claims Act (FCA) imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." **31 U.S.C. § 3729(a)(1)(A)-(B)**. "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1070 (8th Cir. 2016). Qui tam provisions permit private persons, relators, to sue for violations in the name of the United States and to recover part of the proceeds if successful. **§ 3730(b), (d)**.

"Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)." *Joshi*, 441 F.3d at 556. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." This gives defendants notice and protects them from baseless claims. *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 918 (8th Cir. 2014). While Rule 9(b) is "context specific and flexible," *id.*, a plaintiff cannot meet this burden with conclusory and generalized allegations. *Joshi*, 441 F.3d at 557. Where "the facts constituting the fraud are peculiarly within the opposing party's knowledge," the "allegations may be pleaded on information and belief" if "accompanied by a statement of facts on which the belief is founded." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th Cir. 2009).

-4-

To satisfy the particularity requirement for FCA claims, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Joshi*, 441 F.3d at 556. A relator can meet the Rule 9(b) requirements by pleading (1) "representative examples of the false claims," or (2) the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Thayer*, 765 F.3d at 918. To satisfy the particular details requirement, the complaint must "provide sufficient details to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Id.* at 918-19.

## A.

In Count I, the relators contend that CCMH submitted false claims through a wide-ranging fraudulent scheme. First, the complaint alleges that shortly after Bruce became CEO, CCMH required paramedics to perform breathing treatments previously provided by nursing staff. Hospital management told employees this change was for "billing" and "cost reimbursement purposes" and required them to document each treatment at 30 minutes, regardless of its length. The complaint alleges—upon information and belief—that these changes allowed CCMH to bill these treatments separately to get a higher reimbursement from Medicare. Further, the complaint alleges that CCMH treats paramedics as "specialized staff," making the treatments separately billable. Relators also contend—upon information and belief—that patients are receiving breathing treatments who do not need them.

Second, the complaint alleges that CCMH ordered paramedics and EMTs to perform laboratory services, like blood draws. The relators claim—upon information and belief—that this change, like the breathing treatments, was intended to increase Medicare reimbursement by allowing CCMH to bill these services separately. Third,

the complaint identifies three employees with misclassified titles. For example, the complaint alleges—upon information and belief—that CCMH billed Medicare for Richard's services as a paramedic, though he was "not properly licensed." Fourth, the relators claim paramedics and EMTs provided services at two other health care facilities—Eventide and Denison. Based on information and belief, CCMH instituted this change to increase Medicare reimbursement. Finally, the complaint alleges that CCMH reported improper expenses to Medicare. Relators contend—upon information and belief—that CCMH submitted cost reports to Medicare with payments to Bruce's relatives above the market value and with duplicate payments to the credit card companies and the sellers.

Relators did not plead representative samples of false claims. In *Joshi*, a hospital anesthesiologist brought a qui tam claim alleging that the hospital sought Medicare reimbursements at higher rates and submitted claims for services and supplies not provided. *Joshi*, 441 F.3d at 554. Joshi did not provide representative samples, but alleged that every claim over a sixteen-year period was fraudulent. *Id.* at 556-57. Though Rule 9(b) does not require alleging the "specific details of *every* alleged fraudulent claim," this court dismissed Joshi's claim because a relator "must provide *some* representative examples of [the] alleged fraudulent conduct, specifying the time, place, and content of [the] acts and the identity of the actors." *Id.* at 557.

The relators here pleaded more than the relator in *Joshi*. However, like *Joshi*, the complaint here alleges a fraudulent scheme without representative examples with the required specificity. For instance, the complaint alleges CCMH submitted false claims for unnecessary breathing treatments. It gives one example of a patient who received an unnecessary breathing treatment, but fails to include the date, the provider performing the treatment, any specific information about the patient, what money was obtained, and most importantly, whether a claim was actually submitted for that particular patient.

Under *Thayer*, a relator can also satisfy Rule 9(b) by pleading the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." ***Thayer***, 765 F.3d at 918. The allegations in Count I are close to meeting this standard. The complaint includes some details of the fraudulent scheme. It pleads the names of the individuals that instructed them to carry out the breathing treatments and blood draws, the two-year period when these services were provided, and statements by their supervisor that the changes to the breathing treatments were for billing and cost reimbursement purposes. The complaint also pleads how hospital management told them to document each breathing treatment at 30 minutes, regardless of its length. It includes the names of three individuals who relators believed were misclassified, and how Christie and Trader learned of Richard's licensure violation. The relators also give some details about one receipt for gas and moving expenses that was allegedly altered.

However, the complaint lacks the sufficient indicia of reliability leading to a strong inference that claims were actually submitted. In *Thayer*, the relator—a center manager for several Planned Parenthood clinics—alleged a fraudulent scheme. ***Id.*** at 919. This court emphasized that the relator's position as center manager gave her personal knowledge that false claims were submitted and allowed her to plead specific details about the billing system and practices, providing sufficient indicia of reliability for two of Thayer's claims. ***Id.*** This court dismissed another claim where Thayer did not have "access to the billing systems . . . [or] knowledge of their billing practices," leaving her "only able to speculate that false claims were submitted . . . ." ***Id.*** at 919-20.

The relators here—paramedics and EMTs—did not have access to the billing department. The complaint did not include any details about CCMH's billing practices. *See **United States ex rel. Grubbs v. Kanneganti***, 565 F.3d 180, 190-91 (5th Cir. 2009) ("Confronting False Claims Act defendants with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were

submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into—gives defendants adequate notice of the claims."). Nor did the complaint allege that the relators had personal knowledge of the billing system or the submission of false claims. *See United States ex rel. Prather v. Brookdale Senior Living Cmtys.*, 838 F.3d 750, 769-70 (6th Cir. 2016) (relator's allegations gave reliable indicia because she had knowledge of billing documentation and pleaded specific details like the treatment of four patients, the dates of care, the dates the false certification occurred, and the amount requested for final payment). Some of the facts pleaded—such as their supervisor's statements that the changes to breathing treatments were for billing and cost reimbursement purposes—shows the *possibility* that CCMH submitted claims. However, the facts pleaded do not "lead to a *strong inference* that claims were actually submitted." *Thayer*, 765 F.3d at 918 (emphasis added). *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 472 (6th Cir. 2011) ("[T]his is not a situation in which the alleged facts support a strong inference—rather than simply a possibility—that a false claim was presented to the government."); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005) (declining to "make inferences about the submission of fraudulent claims because such an assumption would 'strip[ ] all meaning from Rule 9(b)'s requirements of specificity'") (alteration in original).

The relators pleaded many key facts upon information and belief, without providing a "statement of facts on which the belief is founded." *Drobnak*, 561 F.3d at 784. *See, e.g.*, **Compl. ¶ 59** ("Upon information and belief, Richard's services were billed, in part, to Medicare. Richard was not, however, licensed in the State of Iowa as a paramedic."). They allege, "Certain vendors paid by the hospital are personally related to Bruce and their services are paid well above market value. For example, thousands of dollars have been paid to Bruce's brother, who, upon information and belief, owns an out-of-state moving company . . . [which] is paid from CCMH funds to move doctors . . . when it would be more economical to use a local moving company." *Id.* ¶ 74. Relators then claim, upon information and belief, that these

expenses were included in cost reports to Medicare. They do not explain how they know Bruce's brother owns a moving company or that CCMH is using it. A generalized allegation that the hospital paid vendors above market value and submitted a false cost report—without a statement of facts on which the belief is founded—does not sufficiently demonstrate that these were improper expenses or were included on cost reports. *See **Drobnak***, 561 F.3d at 784 (when pleading on information and belief, allegations must be "accompanied by a statement of facts on which the belief is founded").

Other allegations, which are not pleaded upon information and belief, similarly do not identify the underlying basis for the assertions. *See **Thayer***, 765 F.3d at 919 ("Thayer's claims thus have sufficient indicia of reliability because she provided the underlying factual bases for her allegations."). For instance, the relators plead, "The paramedics were told by their managers, in writing, that no matter how long the breathing treatments took, to document on the timesheets that the treatments took at least 30 minutes. These timesheets are used in billing to Medicare." **Compl. ¶ 30**. The relators—who do not allege personal knowledge of the hospital's billing practices—do not explain how they knew the timesheets were used to bill Medicare. They also do not plead a single example where they performed a breathing treatment in less than 30 minutes.

Because the relators failed to plead fraud with particularity, the district court properly dismissed Count I under Rule 9(b).

B.

In Count II, relators sued under 31 U.S.C. § 3729(a)(1)(B), which imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The false statements alleged include: records for 30-minute breathing treatments, records for breathing

treatments listing paramedics as "specialized ancillary staff," improper payment requests for non-CCMH expenses, documents misclassifying employees like Richard, and cost reports listing false costs. Though claims under § 3729(a)(1)(B) do not require proof that CCMH submitted a false claim, relators must still "plead a connection between the alleged fraud and an actual claim made to the government." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017). *See* *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) (reasoning that a relator asserting a claim under § 3729(a)(1)(B) "is still required to show that a false claim was submitted to the government"). *Cf.* *Grubbs*, 565 F.3d at 193 ("[T]he recording of a false record, when it is made with the requisite intent" to get a false claim paid "is enough to satisfy the statute . . . ."). The complaint here, as discussed above, fails to connect the false records or statements to any claim made to the government. Further, like Count I, many of the allegations are founded upon information and belief without a statement of facts on which the belief is founded. *Drobnak*, 561 F.3d at 784. Count II was properly dismissed.

C.

Count III alleges that CCMH conspired with Eventide to violate the Anti-Kickback Statute. To satisfy Rule 9(b)'s particularity requirements, this claim must plead the details of a conspiracy, including an agreement between CCMH and Eventide, and an overt act in furtherance of the conspiracy. *Grubbs*, 565 F.3d at 193. Because the complaint does not include any details about an agreement, the relators fail to plead the conspiracy with particularity. The district court properly dismissed the conspiracy claim.

III.

The FCA protects employees who are "discharged, demoted, . . . harassed, or in any other manner discriminated against in the terms and conditions of employment

because of lawful acts done by the employee . . . in furtherance of" a civil action under the FCA "or other efforts to stop 1 or more violations" of the FCA. **31 U.S.C. § 3730(h)**. To prove retaliation in violation of the FCA, a plaintiff must prove that "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).

The relators allege that Bruce can be held individually liable for his acts in their FCA retaliation claims. CCMH—not Bruce—is the relators' employer. They appear to argue that a 2009 amendment to the FCA—which removed an explicit reference to retaliatory acts by an "employer"—expands liability. Before the 2009 amendment, federal courts—including this court—uniformly held that the FCA did not impose individual liability for retaliation claims. *See United States ex rel. Golden v. Arkansas Game & Fish Comm'n*, 333 F.3d 867, 870-71 (8th Cir. 2003). After the 2009 amendment, numerous courts still hold that the FCA does not create individual liability because Congress deleted the word "employer" so contractors and agents could bring FCA retaliation claims. *E.g.*, *Howell v. Town of Ball*, 827 F.3d 515, 529-30 (5th Cir. 2016). "Congress acts with knowledge of existing law, and [ ] absent a clear manifestation of contrary intent, a . . . revised statute is presumed to be harmonious with existing law and its judicial construction." *Estate of Wood v. C.I.R.*, 909 F.2d 1155, 1160 (8th Cir. 1990). Because Congress did not amend the FCA to impose individual liability, the FCA does not impose individual liability for retaliation claims. The district court correctly dismissed the claims against Bruce.

A.

To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face," meaning that the "plaintiff pleads factual content that allows

-11-

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *quoting* **Bell Atlantic Corp. v. Twombly**, 550 U.S. 544, 570 (2007). This court reviews de novo the dismissal for failure to state a claim. *Drobnak*, 561 F.3d at 783.

The district court found that Christie and Trader did not engage in protected activity and dismissed their claims. Christie and Trader claim they engaged in two different types of protected activity: (1) complaining to hospital staff about the breathing treatments, and (2) reporting Richard's license violation to the State. Additionally, Christie claims his investigations into CCMH's financial matters are protected activity. An employee's conduct must satisfy two conditions to constitute protected activity. *Schuhardt*, 390 F.3d at 567. First, it "must have been in furtherance of an FCA action" or an effort to stop one or more FCA violations. **§ 3730(h)**; *Schuhardt*, 390 F.3d at 567. Second, the conduct "must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action," meaning the employee "in good faith believes, and . . . a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Schuhardt*, 390 F.3d at 567.

Even assuming Christie and Trader engaged in protected activity, their retaliation claims fail to state a plausible claim because they did not adequately plead that CCMH knew they were engaging in protected activity. They must show CCMH knew they were "either taking action in furtherance of a private *qui tam* action . . . [,] assisting in an FCA action brought by the government," or taking some other action to stop an FCA violation. *Id.* at 568; **§ 3730(h)**. Christie and Trader both complained to hospital staff about the breathing treatments and the financial situation at CCMH. Christie also emailed the compliance manager to inform CCMH he made a report about Richard's license "as required by Iowa law." However, to provide actual or constructive knowledge, employees must connect the alleged misconduct to fraudulent or illegal activity or the FCA. *See Schuhardt*, 390 F.3d at 568-69 (plaintiff gave her

-12-

employer notice of protected activity after she advised her supervisor that the organization's conduct could be "fraudulent and illegal" and that "if the OIG would come in they would frown upon us and they'd pretty much wipe us out"). The complaint here does not allege that Christie and Trader told CCMH or the State that CCMH's behavior was fraudulent or potentially subjected it to FCA liability. Reporting a license violation to the State does not tell CCMH that these employees believe it is acting fraudulently, especially where Christie pleaded he was "required to tell" state officials about Richard's license because "otherwise he himself could lose his licensure" under state law. Likewise, complaining to hospital staff about CCMH's financial situation and the changes to breathing treatments does not give CCMH notice that Christie and Trader were taking action in furtherance of a qui tam action or to stop an FCA violation. *Id.* at 568.

Because the relators did not sufficiently plead that CCMH knew they were engaging in protected activity, the district court properly dismissed their retaliation claims.

B.

This court reviews de novo the grant of summary judgment, viewing all evidence most favorably to the nonmoving party. *Id.* at 566. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(a)**. CCMH is entitled to summary judgment if Strubbe "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *See **Celotex Corp. v. Catrett***, 477 U.S. 317, 323 (1986).

In the absence of direct evidence of retaliation, courts apply the *McDonnell Douglas* framework to retaliation claims. ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792 (1973). While this court has not explicitly adopted this framework for FCA

retaliation claims, it applies it to other whistleblower statutes. *See, e.g.*, ***Elkharwily v. Mayo Holding Co.***, 823 F.3d 462, 470 (8th Cir. 2016) (assuming without deciding that the framework applies to the Emergency Medical Treatment Active Labor Act). Most of the other circuits use the framework for FCA retaliation claims. *See **Diaz v. Kaplan Higher Educ., L.L.C.***, 820 F.3d 172, 175 & n.3 (5th Cir. 2016) (collecting cases and adopting the framework for FCA retaliation claims). This court will apply the *McDonnell Douglas* framework to FCA retaliation claims.

Under *McDonnell Douglas*, Strubbe bears the initial burden of establishing a prima facie case of FCA retaliation. ***Elkharwily***, 823 F.3d at 470. To establish a prima facie case, Strubbe must show that (1) she engaged in protected conduct, (2) CCMH knew she engaged in protected conduct, (3) CCMH retaliated against her, and (4) "the retaliation was motivated solely by [Strubbe's] protected activity." ***Schuhardt***, 390 F.3d at 566. If Strubbe establishes a prima facie case, the burden shifts to CCMH to "articulate a legitimate reason for the adverse action." ***Elkharwily***, 823 F.3d at 470. The burden then shifts back to Strubbe to demonstrate that "the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action." ***Id.***

Like Christie and Trader, Strubbe's complaints to the CCMH Board and sheriff about "financial wrongdoing" and her investigations into CCMH's finances are not protected activity. There is no indication they were made in furtherance of an FCA action or were an effort to stop an FCA violation. She did not connect her concerns about CCMH's finances to fraud, the FCA, or any unlawful activity. *See **Green v. City of St. Louis***, 507 F.3d 662, 667-68 (8th Cir. 2007) (reasoning the plaintiff did not engage in protected activity because he admitted he did not know whether the city submitted any document with false information when he complained about the city's policy). *See also **Robertson v. Bell Helicopter Textron, Inc.***, 32 F.3d 948, 951 (5th Cir. 1994) (recognizing that to engage in protected activity, an employee should

-14-

"express concerns about possible fraud to their employers"). However, Strubbe's filing of an FCA claim is protected conduct. **§ 3730(h)**.

The complaint was unsealed in November 2015, alerting CCMH that Strubbe engaged in protected activity. Strubbe claims that CCMH had notice before this because the federal government sent informal interrogatories to CCMH in August 2015 that mimicked the open records request her attorney sent in March. Strubbe presented no evidence, however, that CCMH knew her attorney sent that records request. Strubbe has shown only that CCMH had knowledge of her protected activity beginning in November 2015.

Retaliatory acts under the FCA include discharging, demoting, suspending, threatening, harrassing, or otherwise discriminating against an employee. **§ 3730(h)(1)**. Strubbe's removal from part-time status—effectively a termination—in March 2016 is a retaliatory act.

Strubbe cannot prove that her termination was solely motivated by protected activity. She contends causation can be inferred because CCMH assigned her light-duty work after she was injured, but stopped once it learned of her FCA claim. Meanwhile, Stacey Kruse, another employee with a shoulder injury, continued to get light-duty work. Strubbe claims that an email from CCMH to Kruse, describing Kruse as a "low key injured employee," provides further proof CCMH removed her from part-time status because of her protected conduct. However, these events all occurred before CCMH knew Strubbe brought the FCA claim. They do not demonstrate CCMH terminated Strubbe solely because of her protected conduct.

CCMH did not terminate Strubbe until four months after learning of her involvement in the FCA claim. By then, she had not performed work at CCMH for six months. A temporal connection between the protected conduct and adverse action may be sufficient to establish a prima facie case where the proximity is "very close."

*Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (two weeks between protected conduct and adverse action sufficient to establish prima facie case). Generally, however, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). Here, the four months between the unsealing of the complaint and her removal from part-time status is too attenuated to establish a prima facie case. *See Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (two months between complaint and termination "dilutes any inference of causation").

Even if the facts suggested Strubbe's removal was solely motivated by her protected conduct, CCMH has provided a legitimate, non-discriminatory reason. CCMH claims it removed Strubbe from part-time status under its policy requiring employees to have worked in the previous six months. Strubbe can prove this reason is pretextual by showing CCMH "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015). CCMH's policy states, "The minimum requirement to remain a per diem employee is to have worked in the past six months . . . ." CCMH followed this policy when it terminated Strubbe. By the time it removed her from part-time status, Strubbe had not worked as an EMT for over a year and had not performed any work for CCMH for six months. CCMH has not changed its explanation for Strubbe's termination.

Strubbe claims that CCMH treated Kruse, a similarly situated employee, differently by giving her light-duty work. Strubbe has not demonstrated that Kruse is similarly situated. She did not provide sufficient information detailing the significance of Kruse's injury, her physical limitations, her position at CCMH, or whether she had worked in the last six months. Further, CCMH sent Kruse the email

-16-

describing her as a "low key injured employee" before CCMH learned of Strubbe's FCA claim. Strubbe cannot show that CCMH's reason for her termination was pretextual.

The district court properly granted summary judgment for CCMH.

\* \* \* \* \* \* \*

The judgment is affirmed.

BEAM, Circuit Judge, dissenting in part and concurring in part.

I acknowledge that fraud cases receive more scrutiny at the pleadings stage than the average civil case. In a fraud case, rather than simply providing notice in the pleadings under Federal Rule of Civil Procedure 8, a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Originally, Rule 8 required something akin to, "I'm hurt, you did it, pay me." See Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (holding that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). But see Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) & Ashcroft v. Iqbal, 556 U.S. 662 (2009) (effecting a landslide erosion of Conley's liberal construction of Rule 8's pleading standard). Because the FCA is an anti-fraud statute, the complaint's false-claim allegations must comply with Rule 9(b). However because Rule 9 does not eliminate Rule 8's notice pleading standard, Zayed v. Associated Bank, N.A., 779 F.3d 727, 733 (8th Cir. 2015), and the relators' pleadings in Counts I and II of their complaint more than adequately give notice, with particularity, of the fraud they are alleging, I dissent in part.

-17-

"To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006). As the majority opinion acknowledges, "[t]he relators here pleaded more than the relator in Joshi" and that "[t]he allegations in Count I are *close* to meeting this standard." Ante at 6-7 (emphasis added). And yet, the court still requires more of a relator than is necessary at this stage of the proceedings.

I would find that the relators have met Rule 8 and 9 (and Joshi's) requirement for pleading fraud with particularity. 441 F.3d at 556. Indeed, the majority opinion and the district court essentially require that the relators here witness the Medicare forms being submitted in order to get past the pleading stage in this case. If that were the case, only someone with access to the hospital's internal accounting records could successfully bring a qui tam action in this situation. Indeed, as relators point out, the accounting records became unaccessible to employees and the public once Bill Bruce became CEO (and incidentally, the HR manager) of the hospital. Bruce and the hospital can thus effectively eliminate any civil liability for false claims by eliminating access to financial information.

The complaint contained 198 paragraphs, including 55 paragraphs in the "Specific and Detailed Allegations" section, and spelled out the impropriety of EMTs and paramedics being asked to perform work differently, and to perform work–(i.e., breathing treatments on *inpatients*)–that EMTs and paramedics were not the most qualified and certainly not the most conveniently situated to perform. The complaint alleges the relators were told the reason for this abrupt change in procedure and policy was for "billing" purposes. Comp. ¶¶ 26-28. The complaint detailed the exponential increase in separately billed "breathing" treatments even while the number of hospital patients declined. ¶¶ 33-35. The complaint detailed how relators were required to

make false entries into the computer system that was used for Medicare billing–averring that the treatments lasted at least thirty minutes regardless of how long the treatment lasted. ¶¶ 30, 98. Requiring the relators to plead an exact day in which any one of them performed a breathing treatment in less than 30 minutes, see ante at 9, is more than is necessary. United States ex. rel Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914, 917-18 (8th Cir. 2014) (holding that a relator does not have to plead specific examples in every case, and instead a "relator can satisfy Rule 9(b) by 'alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted'") (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).

Further, the relators did provide a concrete example of a terminal patient who clearly did *not* need a breathing treatment but was required to get one. ¶ 37. Relators pleaded with particularity that "Patient A, known to Relator Trader, was ordered to receive breathing treatments despite having been in a traumatic, clearly terminal, accident." Id. Two of the relators questioned the hospital's nurses about giving breathing treatments to other patients who clearly did "not need the treatments, but they were told to give the treatments anyway." ¶ 38. The complaint goes on to explain that breathing treatments given by paramedics, as opposed to nurses, are billed differently and generate more revenue for the hospital. ¶¶ 39-53. There are links to governmental and industry documents explaining this process.[2] The complaint details specific accounts of staff who were held out to be, and required to perform, acts of paramedics and phlebotomists despite their lack of certification. ¶¶ 59-63.

Although relators were not in a position to see the bills generated after such computer entries, the pleadings gave adequate notice of the natural inference that the

---

[2]Some of the government website links no longer work or have been moved, but many of the links do indeed provide the documentation described in the complaint.

breathing treatments were fraudulently and inflatedly billed the way they were entered. Further, evidence of fraud–Bruce's purported misuse of a hospital credit card–is documented with particularity in the complaint including: the day of payment to "Money Gram," the amount of payment, and the outcome of an open records request which resulted in the production of an altered receipt. ¶ 70.

In short, the district court, and a majority of this court, essentially hold that short of the relators committing criminal activity by illegally accessing the hospital's billing records, they cannot successfully plead a false claims act case of Medicare billing fraud. This should not be the state of the law, especially as here "when the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion." Bos. & Maine Corp. v. Town of Hampton, 987 F.2d 855, 866 (1st Cir. 1993), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 66-67 (1st Cir. 2004). In such cases, "less specificity of pleading may be required pending discovery." 987 F.2d at 866. See also United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d 29, 37-41 (1st Cir. 2017) (noting that inferences can be used at the pleading stage of a fraud case, especially where the relators have little access to documentation, but clear knowledge of the scheme), cert. denied, 18 S. Ct. 1551 (2018). Accordingly, I dissent from Part IIA and IIB of the opinion affirming the dismissal of Counts I and II of the complaint. I concur in the remainder of the court's opinion.

—————————————————————