# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1207
_____

United States of America, ex rel Rafik Benaissa, M.D., Relator

*Plaintiff - Appellant*

v.

Trinity Health; Trinity Hospital; Trinity Kenmare Community Hospital; Trinity Hospital - St. Joseph's

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of North Dakota - Bismarck
_____

Submitted: February 12, 2020
Filed: June 25, 2020
_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

This is a qui tam action brought by Dr. Rafik Benaissa against Trinity Health, Trinity Hospital, Trinity Kenmare Hospital, and Trinity Hospital – St. Joseph's (collectively, Trinity). Dr. Benaissa alleges that Trinity violated the False Claims Act (FCA) by knowingly presenting a false or fraudulent claim to the government in

violation of 31 U.S.C. § 3729(a)(1)(A), making a false statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B), and retaliating against him in violation of 31 U.S.C. § 3730(h). The district court[1] granted Trinity's motion to dismiss for failure to state a claim. Finding no error, we affirm.

## I. Background

Trinity operates a regional healthcare system based in Minot, North Dakota. Dr. Benaissa was a trauma surgeon at one of Trinity's hospitals from 2003 to 2015. In his Amended Complaint, Dr. Benaissa alleges that Trinity paid physicians for referrals in violation of the federal Stark and Anti-Kickback laws.[2] He asserts that these underlying violations of the Stark and Anti-Kickback laws resulted in the presentment of false or fraudulent claims to the government, in violation of the FCA, because "services provided in violation of the Stark and Anti-Kickback laws are ineligible for government payment," see 42 U.S.C. §§ 1320a-7b(g); 1395nn(a)(1)(B) and (g)(1), and "Trinity submitted bills for these services."

To support his claim that Trinity violated the Stark and Anti-Kickback laws, Dr. Benaissa identifies five physicians whom Trinity paid in excess of the 90th percentile of compensation for their specialties. He contends that these physicians' high salaries were not merited by their skills, credentials, or personal productivity. Instead, he alleges that Trinity paid them in part for illegally referring patients for

---

[1]The Honorable Daniel L. Hovland, then Chief Judge, United States District Court for the District of North Dakota.

[2]The Stark law prohibits physicians from making referrals to hospitals or other entities with which they have a financial relationship. See 42 U.S.C. § 1395nn(a)(1). The Anti-Kickback statute prohibits soliciting or receiving anything of value in exchange for a referral of medical services. See 42 U.S.C. § 1320a-7b(b)(1).

additional services at Trinity. He asserts that, if these physicians were not making illegal referrals, Trinity would have lost money by paying their high salaries.

Dr. Benaissa further alleges that, as a consequence of Trinity's compensation scheme, these physicians performed unnecessary surgeries to justify their high salaries. He states that two dental surgeons performed reconstructive surgeries that were within "the field of a plastic surgeon or an ENT surgeon" and not usually performed by dental surgeons. He also asserts that a cardiologist performed unnecessary vascular surgeries that were not within the standard of care. And he describes five instances in which an orthopedic surgeon, Dr. Joshi, performed operations that were not necessary or were medically ill-advised.

Dr. Benaissa alleges that he and others complained about Dr. Joshi's unnecessary surgeries. In 2012, he reported to Trinity's leadership that Dr. Joshi was "not ethical and was doing a large number of unnecessary surgeries," and he requested that leadership review one of Dr. Joshi's surgeries. He was told, "Don't say that in public." A member of Trinity's leadership later informed Dr. Benaissa that there were "problems" with Dr. Joshi's care, but the results of Trinity's review were confidential. In 2015, a neurosurgeon told Dr. Benaissa that Trinity knew Dr. Joshi was performing unnecessary surgeries, but it was difficult to prove. Later that year, an operating-room technician told Dr. Benaissa that Dr. Joshi was "out of control" and was doing an unnecessary surgery to repair ankle fractures. A medical-device representative also told Dr. Benaissa that he believed some of Dr. Joshi's operations were not "kosher." And Dr. Joshi's former nurse sent Dr. Benaissa a letter alleging that Dr. Joshi was performing unnecessary surgeries, some of which had resulted in deaths, and that Trinity "simply covered up all his mistakes and let them go." The nurse later repeated these allegations to Dr. Benaissa in person.

Another physician told Trinity's CEO that Dr. Joshi was writing abnormally long consults so he could bill Medicare at a higher rate. Dr. Benaissa alleges that,

after this meeting, the physician told him that Dr. Joshi was "untouchable" because he was "a big money maker." Dr. Benaissa also alleges that, after he was in a dispute with Dr. Joshi, the Chief of Surgery "fabricated" a story about Dr. Benaissa behaving in an unprofessional manner. A few weeks later, Dr. Benaissa was informed that Trinity would not be renewing his contract.

Dr. Benaissa argues that these allegations give rise to a plausible inference that Trinity paid these five physicians for referrals in violation of the Stark and Anti-Kickback laws. See 42 U.S.C. §§ 1395nn(a)(1); 1320a-7b(b)(1). And he contends that, because the government will not pay claims that are tainted by violations of these statutes, see 42 U.S.C. §§ 1320a-7b(g); 1395nn(a)(1)(B) and (g)(1), every claim submitted by these physicians constitutes a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(A). Further, Dr. Benaissa alleges that Trinity submitted provider agreements and annual cost reports to the government that were necessary to participate in the Medicare program, and that these agreements and reports falsely stated that Trinity had not violated and would not violate the Stark and Anti-Kickback laws. He contends that these were false statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B). Finally, Dr. Benaissa argues that he was terminated in retaliation for his complaints about Trinity's unlawful scheme in violation of 31 U.S.C. § 3730(h).

The district court granted Trinity's motion to dismiss for failure to state a claim. As to the § 3729(a)(1)(A) claim, the court concluded that Dr. Benaissa had failed to allege with particularity that Trinity presented a false or fraudulent claim to the government. As to the § 3729(a)(1)(B) claim, the court held that Dr. Benaissa had failed to allege with particularity that Trinity made, used, or caused to be used a false record or statement. And as to the retaliation claim, the district court concluded that Dr. Benaissa had failed to allege that he engaged in "protected activity" or that Trinity had knowledge of his protected activity. This appeal followed.

-4-

## II. Analysis

"Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)" of the Federal Rules of Civil Procedure. United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This particularity requirement demands a higher degree of notice than that required for other claims," and "is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003). To satisfy Rule 9(b)'s particularity requirement, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." Joshi, 441 F.3d at 556.

"This court reviews de novo the district court's dismissal of a claim under Rule 9(b), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." United States ex rel. Strubbe v. Crawford Cty. Mem'l Hosp., 915 F.3d 1158, 1162–63 (8th Cir. 2019) (cleaned up).

### A.    The § 3729(a)(1)(A) Claim

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). "The FCA is not concerned with regulatory noncompliance. Rather, it serves a more specific function, protecting the federal fisc by imposing severe penalties on those whose false or fraudulent claims cause the government to pay money." United States ex rel. Dunn v. N. Mem'l Health Care, 739 F.3d 417, 419 (8th Cir. 2014) (citation omitted). "Accordingly, the FCA generally attaches liability,

not to the underlying fraudulent activity, but to the claim for payment." Id. (cleaned up).

The first element of a § 3729(a)(1)(A) claim, often referred to as the "presentment requirement," requires a plaintiff to allege with particularity that the defendant presented, or caused to be presented, a claim for payment or approval. When a plaintiff alleges that a defendant engaged in a systematic practice or scheme of submitting fraudulent claims, the plaintiff is not required to "allege specific details of *every* alleged fraudulent claim forming the basis of [their] complaint." Joshi, 441 F.3d at 557. However, the plaintiff must provide "sufficient details to enable the defendant to respond specifically and quickly" to their allegations that the defendant presented false claims for payment or approval. See Strubbe, 915 F.3d at 1163 (citation omitted). A plaintiff can satisfy this requirement "by pleading (1) representative examples of the false claims, or (2) the particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." See id. (cleaned up).

Dr. Benaissa concedes that he has not alleged representative examples of false claims that Trinity presented for payment or approval. However, he argues that "two facts" show that his allegations satisfy the second method of pleading with particularity that false claims were submitted. First, he alleges that Trinity received a large Medicare reimbursement representing approximately 28–29% of its annual revenue. Second, he asserts that, if Trinity compensated physicians for illegal referrals in violation of the federal Stark and Anti-Kickback statutes, every claim submitted for services provided by those physicians would be a false or fraudulent claim under the FCA. Thus, he asks, "which is more likely: that Trinity did not submit any claims for the services associated with these physicians or that Trinity submitted at least some claims for such services?"

We have previously rejected allegations of this sort as insufficient. In Joshi, the plaintiff argued that he had alleged presentment with particularity "by his allegations that 'all the nurse anesthetists' work was illegal,' and that 'every invoice for nurse anesthetist work was fraudulent because no nurse anesthetist was medically supervised or directed.'" 441 F.3d at 556. We held that "Rule 9(b) requires more than such conclusory and generalized allegations." Id. To support this conclusion, we cited the Eleventh Circuit's rule that the plaintiff's allegations of presentment must contain "indicia of reliability" to satisfy Rule 9(b)'s particularity requirement. See id. at 557 (citing Corsello v. Lincare, Inc., 428 F.3d 1008, 1013 (11th Cir. 2005)). The Eleventh Circuit had held that, because "[t]he act of submitting a fraudulent claim to the government is the *sine qua non* of a False Claims Act violation," it was insufficient to "describe[] in detail a private scheme to defraud" and then speculate that claims "must have been submitted, were likely submitted or should have been submitted to the Government." Corsello, 428 F.3d at 1012–13 (cleaned up). However, it had allowed claims to go forward where the plaintiff had an "underlying basis" for asserting that false claims had been presented, such as "'firsthand information' about the billing practices of the defendant." Id. at 1013–14 (citation omitted).

Applying this rule in Joshi, we concluded that the plaintiff's allegations lacked sufficient "indicia of reliability" because the plaintiff "was an anesthesiologist . . . , not a member of the billing department, and his conclusory allegations [we]re unsupported by specific details of [the defendants'] alleged fraudulent behavior." 441 F.3d at 557. In Thayer, by contrast, we concluded that the plaintiff's allegations contained sufficient "indicia of reliability" because the plaintiff oversaw the defendant's billing and claims systems and pleaded personal, firsthand knowledge of the defendant's submission of false claims. See United States ex rel. Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914, 917 (8th Cir. 2014).

As a trauma surgeon, Dr. Benaissa does not have firsthand knowledge of Trinity's billing practices. He also has not pleaded details about Trinity's billing practices indicating a reliable "basis for knowledge" regarding the submission of fraudulent claims. See Joshi, 441 F.3d at 558. For example, he has not provided dates and descriptions of particular services coupled with "a description of the billing system that the records were likely entered into." See Strubbe, 915 F.3d at 1165 (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)). Instead, he relies solely on two general facts—Trinity's receipt of a large Medicare reimbursement and his allegation that every claim submitted by certain physicians was false or fraudulent—to draw the conclusion that Trinity most likely submitted false claims to the government.

This sort of general inference is "not specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." See Joshi, 441 F.3d at 557 (quoting Costner, 317 F.3d at 889). As a result, it is not sufficient to satisfy Rule 9(b)'s particularity requirement. See Thayer, 765 F.3d at 919–20 (affirming the dismissal of an FCA claim where the plaintiff "failed to provide a factual basis for her knowledge" and was "only able to speculate that false claims were submitted" by certain hospitals); Dunn, 739 F.3d at 420 (stating that a plaintiff may not "rely on the broad allegation that every claim submitted . . . is false in order to satisfy the particularity requirement"); Joshi, 441 F.3d at 557 (conclusory allegations unsupported by firsthand knowledge or particular details are insufficient).

Dr. Benaissa argues that this means that "only members of the billing department or the financial services department of a hospital could qualify as a relator," which is "wildly contrary to the purposes of the [FCA]." We disagree. We have recognized that "an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the FCA." Joshi, 441 F.3d at 560 (cleaned up). But we have not precluded others with reliable

allegations from serving as relators.  See Strubbe, 915 F.3d at 1164 (noting that claims by paramedics and EMTs were "close to meeting this standard").  Other courts applying this same standard have allowed individuals outside of a hospital's billing department to serve as relators where they were able to plead "particular and reliable indicia that false bills were actually submitted as a result of the scheme—such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure."  See Grubbs, 565 F.3d at 189 (psychiatrist); see also United States ex rel. Walker v. R&F Props. of Lake Cty, Inc., 433 F.3d 1349, 1360 (11th Cir. 2005) (nurse practitioner); United States ex rel. Dicken v. Nw. Eye Ctr., No. 13-CV-2691, 2017 WL 2345579, at *2–3 (D. Minn. May 30, 2017) (ophthalmologist).

There is no requirement that a relator must be a member of a hospital's billing or financial-services department.  However, a relator must allege representative examples of false claims or particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.  Strubbe, 915 F.3d at 1163.  Dr. Benaissa's general allegations that Trinity's compensation scheme most likely resulted in the presentment of claims for payment or approval are insufficient to meet this requirement.

## B.    The § 3729(a)(1)(B) Claim

Next, Dr. Benaissa alleges that Trinity falsely certified in its provider agreement and cost reports that it would comply with the Stark and Anti-Kickback laws.  The FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The elements of a § 3729(a)(1)(B) claim are: "(1) the defendant made a false record or statement; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the statement made a

claim for the government to pay money or forfeit money due." United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 500 (8th Cir. 2016) (cleaned up).

There is no "presentment" requirement for a § 3729(a)(1)(B) claim. However, the plaintiff must "plead a connection between the alleged fraud and an actual claim made payable to the government." See Strubbe, 915 F.3d at 1166 (cleaned up). Because Dr. Benaissa has failed to allege with particularity that Trinity submitted a claim for payment to the government, he cannot establish that Trinity's allegedly false statements were "material" to any claim that was actually submitted. See id.

## C.      The Retaliation Claim

Finally, Dr. Benaissa alleges that Trinity retaliated against him in violation of 31 U.S.C. § 3730(h). There are four elements to an FCA retaliation claim: (1) the relator was engaged in protected activity; (2) his employer knew he was engaged in protected activity; (3) his employer retaliated against him; and (4) the retaliation was motivated solely by his protected activity. Id. at 1166–67. To constitute "protected activity," an employee's conduct must have been (1) in furtherance of an FCA action or an effort to stop one or more FCA violations, and (2) aimed at matters which are calculated, or reasonably could lead, to a viable FCA action. Id. at 1167. To show that an employer knew that an employee was engaged in protected activity, the employee "must connect the alleged misconduct to fraudulent or illegal activity under the FCA." Id. at 1168.

Dr. Benaissa alleges that he complained, on two occasions, that Dr. Joshi was performing unnecessary surgeries. However, he does not allege that he connected his complaints to a concern over improper billing or the submission of false claims to the government. Rather, his concern was with the medical propriety and ethical ramifications of Dr. Joshi's procedures. Even assuming that complaining about these issues constitutes "protected activity" under the FCA, Dr. Benaissa has not alleged

-10-

that he told Trinity the "behavior was fraudulent or potentially subjected it to FCA liability." See id. Therefore, his allegations are insufficient to establish that Trinity knew he was engaged in a protected activity.

### III. Conclusion

The district court's judgment is affirmed.

_____