# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 26, 2019        Decided September 20, 2019

No. 18-7158

SYLVIA SINGLETARY, D.V.M.,
APPELLANT

v.

HOWARD UNIVERSITY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01198)

———

*James H. Shoemaker Jr.* argued the cause and filed the briefs for appellant.

*Jennifer L. Curry* argued the cause for appellee. With her on the brief was *Donna M. Glover*.

Before: SRINIVASAN, MILLETT, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* KATSAS.

MILLETT, *Circuit Judge*: Howard University fired Dr. Sylvia Singletary allegedly for objecting both internally and externally to the University's failure to maintain the humane laboratory animal living conditions on which its receipt of federal funding was conditioned. Singletary claims that her termination violated the False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h). The district court dismissed the case for failure to state a claim and denied Singletary's motion for leave to amend her complaint as futile. In light of the proposed amended complaint's particular factual allegations, the district court's decision reflected too narrow a view of the False Claims Act's protection for whistleblowers. For that reason, we reverse and remand for further proceedings.

**I**

**A**

As a voluntary recipient of funding from the federal government for research activities involving live animals, Howard University is subject to several regulatory regimes. Two are relevant here.

The Animal Welfare Act of 1966, 7 U.S.C. §§ 2131–2159, requires that research institutions receiving federal funds meet prescribed standards for the care and monitoring of animals used in their work, *see id.* §§ 2132(e), 2143(a); *see also* 9 C.F.R. § 2.38(k). The Animal Welfare Act's accompanying regulations mandate that, among other things, the temperature of indoor animal housing facilities be "sufficiently regulated by heating or cooling to protect the animals from the extremes of temperature," and "to provide for their health and to prevent their discomfort." 9 C.F.R. § 3.126(a); *see id.* ("The ambient temperature shall not be allowed to fall below nor rise above temperatures compatible with the health and comfort of the

animal.”); *see also* 7 U.S.C. § 2143(a)(2)(A) (specifying that regulations shall “include minimum requirements” for “housing, * * * [and] shelter from extremes of weather and temperatures, * * * [as] the Secretary [of Agriculture] finds necessary for humane handling, care, or treatment of animals”); 9 C.F.R. § 2.33(b)(1) (“Each research facility shall establish and maintain programs of adequate veterinary care that include * * * [t]he availability of appropriate facilities * * * to comply with the provisions of this subchapter[.]”).

The Health Research Extension Act of 1985 (“Extension Act”), 42 U.S.C. § 289d, authorizes the National Institutes of Health (“NIH”) to establish guidelines for the proper care of animals used in biomedical research. *See id.* § 289d(a). To that end, the NIH has produced a Humane Care Policy requiring research institutions to meet the laboratory animal care standards set forth in (i) the Animal Welfare Act and accompanying regulations, and (ii) the National Academies of Sciences’ Guide for the Care and Use of Laboratory Animals (“Care Standards Guide”). *See* Office of Laboratory Animal Welfare, NIH, Dep’t of Health & Human Servs., *Public Health Service Policy on Humane Care and Use of Laboratory Animals* (2015) (“Humane Care Policy”); National Research Council of the Nat’l Academies of Sciences, Eng’g, & Med., *Guide for the Care and Use of Laboratory Animals* (8th ed. 2011); *see also* Laboratory Animal Welfare: Adoption and Implementation of the Eighth Edition of the Guide for the Care and Use of Laboratory Animals, 76 Fed. Reg. 74,803, 74,803 (Dec. 1, 2011) (making the Care Standards Guide the foundation on which research institutions must base their animal care and use programs).

As relevant here, the Care Standards Guide specifies that laboratory animals are to be housed within temperature and humidity ranges “appropriate for the species, to which they can

adapt with minimal stress and physiologic reaction." Care Standards Guide at 43; *see also id.* ("Maintenance of body temperature within normal circadian variation is necessary for animal well-being.").

The Animal Welfare and Extension Acts, and their accompanying regulations, together impose an internal compliance infrastructure to enforce the animal-care standards. The keystone of that infrastructure is the requirement that each research institution have an Institutional Animal Care and Use Committee ("Committee"). *See* 7 U.S.C. § 2143(b); 42 U.S.C. § 289d(b). The Committee's duties include evaluating the institution's research programs, inspecting facilities, preparing semiannual internal compliance evaluations, and reviewing proposed activities involving animals for compliance with the Animal Welfare and Extension Acts. *See* 7 U.S.C. § 2143(b)(3)–(4); 42 U.S.C. § 289d(b)(3)(A); 9 C.F.R. § 2.31(c); Humane Care Policy § IV.B.

To assist in performing those tasks, each Committee's membership includes an "Attending Veterinarian" who is entrusted with the authority to "ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use[.]" 9 C.F.R. § 2.33(a)(2); *accord* 7 U.S.C. § 2143(b)(1); 42 U.S.C. § 289d(b)(2); 9 C.F.R. § 2.31(a)–(b); *see* Humane Care Policy § IV.A.3.b.1; Care Standards Guide at 14. The Committee ultimately reports to the "Institutional Official," who is the individual authorized to commit to the government on behalf of the institution that it will comply with applicable regulations. *See* 9 C.F.R. § 1.1; Humane Care Policy § III.G.

In addition to mandating internal compliance procedures, the Animal Welfare and Extension Acts, and their corresponding regulations, call for periodic external reporting.

On an annual basis, each institution must file a report with the Department of Agriculture and the NIH, respectively, certifying compliance with all required animal welfare standards. *See* 7 U.S.C. § 2143(a)(7); 42 U.S.C. § 289d(b)(3)(A), (C); 9 C.F.R. § 2.36(b)(3). Those certifications are "necessary" for research institutions "to receive and retain * * * grant monies." Proposed Second Am. Complaint ("proposed complaint") ¶ 43, J.A. 137. *See generally* 7 U.S.C. § 2143(f); 42 U.S.C. § 289d(d).

More frequent reporting is necessary in the event animal care standards are not met and remedial measures are undertaken. Under the Humane Care Policy, the Institutional Official must, among other things, "promptly" provide the NIH with a "full explanation" of the "circumstances and actions taken" to remedy (i) "any serious or continuing noncompliance with [the Humane Care Policy,]" or (ii) "any serious deviations from the * * * Guide[.]" Humane Care Policy § IV.F.3. That includes "mechanical failures * * * resulting in actual harm or death to animals[.]" Office of Laboratory Animal Welfare, NIH, *Guidance on Prompt Reporting to OLAW under the PHS Policy on Humane Care and Use of Laboratory Animals* 2–3 (Feb. 24, 2005) ("Prompt Reporting Notice").

All of those requirements come with teeth. If animal care deviations persist after an opportunity to cure, governmental funding agencies including the NIH "shall" revoke financial support for the institution's research activities. 7 U.S.C. § 2143(f); 42 U.S.C. § 289d(d).

**B**

Congress enacted the False Claims Act in the 1860s in response to widespread fraud perpetrated by Civil War contractors. *United States v. Bornstein*, 423 U.S. 303, 305 n.1,

309 (1976); *United States v. McNinch*, 356 U.S. 595, 599 (1958).  As it currently stands, the Act imposes civil penalties and treble damages upon any person who, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government, or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]"  31 U.S.C. § 3729(a)(1)(A)–(B).

To enhance enforcement of the law, the False Claims Act offers protection to whistleblowers who seek to expose or to prevent government fraud.  Specifically, Section 3730(h) entitles "any employee" to:

> all relief necessary to make that employee * * * whole, if that employee * * * is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee * * * in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To make out a claim of retaliation under Section 3730(h), a plaintiff must plead facts showing (i) that she engaged in protected activity, (ii) "because of" which she was retaliated against.  *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998).  To satisfy the second element, a plaintiff must further allege (a) that the employer knew she was engaged in protected activity, and (b) that the retaliation was motivated "at least in part" by her protected activity.  *Id.* (internal quotation marks omitted).

## C

In January 2013, Howard University retained Dr. Sylvia Singletary for a thirty-month appointment as the "Attending Veterinarian" at its Medical School. *See* 9 C.F.R. § 2.33. She was to dedicate 70% of her time and effort to "Administrative Activities" including (i) directing an animal care quality control program, (ii) establishing standard operating procedures for ensuring proper animal welfare, including animal housing and maintenance, (iii) consulting on grants, and (iv) collaborating with other University employees on "all phases of the handling and care of experimental animals[.]" Proposed Complaint Ex. 1, J.A. 165.[1]

Singletary reported directly to Dr. Thomas Obisesan, who was both the University's Vice President for Regulatory Research and Compliance and the Institutional Official responsible for certifying animal-welfare compliance with federal agencies. *See* 9 C.F.R. § 1.1. As Attending Veterinarian, Singletary was a member of the University's Animal Care and Use Committee, along with Obisesan and Dr. Thomas Heinbockel, the Committee's Chair.

Over an approximately nine-month period between Summer 2013 and Spring 2014, Singletary repeatedly warned Obisesan that the air temperature in the laboratory animals'

---

[1] As is appropriate at this procedural stage, these facts are taken from the proposed complaint, documents attached to or incorporated by reference in that complaint, and matters of which the court may take judicial notice. *See Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (citing *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013)). We construe the facts, and reasonable inferences drawn from them, in the light most favorable to Singletary. *See In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 216 (D.C. Cir. 2010).

living quarters was too high. She explained that the conditions, which were "caused by equipment failures" and "physical plant deficiencies," were "not in compliance with [NIH] standards" and "constituted violations of the terms and conditions" of the University's grants from the NIH. Proposed Complaint ¶¶ 17–18, J.A. 129. Singletary urged Obisesan to take corrective action for which only he had authority: to remedy the temperature deviations and to report the University's non-compliance to the federal government. He did not do either.

Singletary then took her concerns to Heinbockel and Dr. Mark Johnson, the Dean of the University's Medical School. Both proved unresponsive. Over the same time period that Singletary was registering complaints and warnings with those University officials, the University "made certifications to the [NIH] and other federal agencies that the laboratory animals * * * were being maintained and cared for under certain federally mandated ambient living conditions." Proposed Complaint ¶ 43, J.A. 137.

Things came to a head when, in mid-April 2014, Singletary arrived at work to find 21 mice dead from heat exhaustion. Because Obisesan had not acted in response to her prior complaints, Singletary took matters into her own hands. She emailed the NIH—her only written communication with the agency during her twenty-month tenure at the University—to report the rodents' deaths. Singletary's message, on which Obisesan and Heinbockel were copied, explained that:

> At 10:45 am, April 15, 2014[,] I found 21 mice dead from heat exhaustion. [A r]oom * * * which houses animals on a[n] [individually ventilated cage] lost power over night. In addition, we have been having difficulty with receiving condition air [*sic*] in the facility. A more detailed report will be submitted after

I have briefed the [Committee] and [Institutional Official].

J.A. 101–102.

In response, the NIH thanked Singletary for her report and directed the Institutional Official, Obisesan, to submit a corrective plan of action. That prompted the University to finally solve the air temperature problem.

Shortly thereafter, in late April or early May, an "incensed" Obisesan "excoriated" Singletary at a faculty meeting, "accusing her of a lack of professionalism and integrity" for "humiliat[ing]" the University before the NIH. Proposed Complaint ¶¶ 25–26, J.A. 131–132. Then on June 20, 2014, the University notified Singletary that it was cutting her appointment short by six months, terminating her employment as of December 2014. Finding her conditions of employment to have become "intolerable," Singletary resigned in August 2014. *Id.* ¶ 34, J.A. 134.

**D**

Singletary filed suit against the University in the United States District Court for the District of Columbia in June 2017. Her initial and first amended complaints asserted (as relevant here) that she was terminated in retaliation for engaging in activity protected by the False Claims Act, 31 U.S.C. § 3730(h). The district court granted the University's motion to dismiss Singletary's first amended complaint. Singletary then sought leave to amend her complaint a second time. Concluding that Singletary's proposed complaint also would not withstand a motion to dismiss, the district court denied the motion as futile. The district court reasoned that Singletary's nine months of complaints about animal mistreatment within

the University and, eventually, her email to the NIH were not "protected activity" under the False Claims Act because they were part and parcel of her role as Attending Veterinarian. J.A. 226–228. The court also ruled that Singletary had failed to allege that the University was aware of her purportedly protected activity.

Singletary filed a timely notice of appeal.

## II

The district court exercised subject matter jurisdiction under 28 U.S.C. § 1331. This court's jurisdiction arises under 28 U.S.C. § 1291.

Leave to amend a complaint should be "freely give[n]" when "justice so requires." FED. R. CIV. P. 15(a)(2). Leave may properly be denied if the proposed amendment is "futil[e]," *Foman v. Davis*, 371 U.S. 178, 182 (1962), such that it would not withstand a motion to dismiss, *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012). A complaint will, in turn, survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

We review *de novo* the denial of a motion for leave to amend on grounds of futility. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1181 (D.C. Cir. 2018).

**III**

To adequately state a claim of retaliation under the False Claims Act, Singletary had to plausibly allege facts showing that (i) she engaged in protected activity, and (ii) the University retaliated against her because of that activity. *See Yesudian*, 153 F.3d at 736. Singletary has made each of those threshold showings, so the district court erred in concluding that her proposed complaint would not withstand a motion to dismiss.

**A**

Protected activity under the False Claims Act's anti-retaliation provision takes two forms. The Act first protects "lawful acts done * * * in furtherance of an action under this section"—that is, steps taken antecedent to a False Claims Act proceeding. 31 U.S.C. § 3730(h)(1). Second, the Act insulates from retaliation lawful acts done in furtherance of "other efforts to stop 1 or more violations of" the False Claims Act. *Id.*

Under the first prong of that test, an employee's lawful acts are in "furtherance of an action under this section" if she "investigat[es] matters that reasonably could lead to," or have a "distinct possibility" of leading to, a "viable False Claims Act case." *Hoyte v. American Nat'l Red Cross*, 518 F.3d 61, 66, 68–69 (D.C. Cir. 2008) (internal quotation marks omitted). Dissatisfaction with one's treatment on the job is not enough. *See Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005). Nor is an employee's "investigation of nothing more than his employer's non-compliance with federal or state regulations." *Hoyte*, 518 F.3d at 66 (quoting *Yesudian*, 153 F.3d at 740). Instead, "[t]o be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent'

claims" submitted for federal funding.  *Yesudian*, 153 F.3d at 740 (quoting 29 U.S.C. § 3729(a)).

A plaintiff may also demonstrate protected activity under Section 3730(h)(1)'s second prong, which, unlike the first, is not tied to the prospect of a False Claims Act proceeding. Instead, the plain statutory text focuses on the whistleblower's "efforts to stop" violations of the statute before they happen or recur.  *See United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 201 (4th Cir. 2018) ("The apparent purpose of the [second prong] is to untether these * * * protected efforts from the need to show that [a False Claims Act] action is in the offing.  Indeed, we and other circuits have recognized that the amended language broadens the scope of protected activity."); *United States ex rel. Chorches v. American Med. Response, Inc.*, 865 F.3d 71, 97 (2d Cir. 2017) (the second prong "broaden[s] the universe of protected conduct under [Section] 3730(h), at least with respect to 'efforts to stop' [False Claims Act] violations").

To put it simply, the focus of the second prong is preventative—stopping "violations"—while the first prong is reactive to an (alleged) actual violation of the statute.  *See, e.g.*, *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 171 (4th Cir. 2016) ("It would be nonsensical to say that these efforts only become protected activity if a lawsuit under the [False Claims Act] becomes a distinct possibility—the second prong is explicitly untethered from any such action.").

To be sure, by covering only efforts to stop "violations *of this subchapter*," 31 U.S.C. § 3730(h)(1) (emphasis added), the second prong (like the first prong) requires that the employee's efforts pertain to fraud in connection with the submission of a claim for federal government funds.  *See Yesudian*, 153 F.3d at 740.  But that test is met as long as the employee has an

objectively reasonable belief that the employer is violating, or will violate, the False Claims Act. *Grant*, 912 F.3d at 201 ("[A]n act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the [False Claims Act]."); *see Chorches*, 865 F.3d at 96 (second prong encompasses a plaintiff's "refusal to engage in the fraudulent scheme, which * * * reasonably could be expected to prevent the submission of a false claim to the government").

In that way, the False Claims Act's whistleblower provision mirrors other federal whistleblower protection laws. *See Yesudian*, 153 F.3d at 741–742 & n.9 (looking to interpretations of other whistleblower protection provisions to interpret the False Claims Act). Whether expressly called for in the statutory text, or the product of judicial or administrative interpretation, many whistleblower protection provisions cover employees who report or oppose what they reasonably believe to be unlawful conduct.[2] That is because "a layperson should

---

[2] Federal whistleblower provisions expressly covering employees who oppose or report what they reasonably believe to be unlawful employer practices include the Affordable Care Act, 29 U.S.C. § 218C(a)(2), the Consumer Products Safety Act of 2008, 15 U.S.C. § 2087(a)(1), the National Defense Authorization Act for Fiscal Year 1987, 10 U.S.C. § 2409(a)(1), the FDA Food Safety Modernization Act, 21 U.S.C. § 399d(a)(1), the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1), and the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8)(A)(i). Federal whistleblower provisions otherwise interpreted as covering employees who oppose or report what they reasonably believe to be unlawful employer practices include the Age Discrimination in Employment Act, 29 U.S.C. § 623(d); *Heggemeier v. Caldwell County*, 826 F.3d

not be burdened with the 'sometimes impossible task' of correctly anticipating how a given court will interpret a particular statute." *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981) (quoting *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045–1046 (7th Cir. 1980)).[3]

---

861, 869 (5th Cir. 2016), the Americans with Disabilities Act, 42 U.S.C. § 12203(a); *Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 821 (8th Cir. 2013), the Family Medical Leave Act, 29 U.S.C. § 2615(a)(2); *Lott v. Not-for-Profit Hosp. Corp.*, 319 F. Supp. 3d 277, 282 (D.D.C. 2018); 29 C.F.R. § 825.220(e), the Federal Mine Safety and Health Act, 30 U.S.C. § 815(c); *Gilbert v. Federal Mine Safety & Health Review Comm'n*, 866 F.2d 1433, 1439 (D.C. Cir. 1989), the Pipeline Safety Improvement Act, 49 U.S.C. § 60129(a)(1); *Rocha v. Air Util. Corp.*, No. 07-112, 2009 WL 1898237, at \*6 (DOL Adm. Rev. Bd. June 25, 2009); 70 Fed. Reg. 17,889, 17,890–17,891 (April 8, 2005), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); *Grosdidier v. Broadcasting Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013), and the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(a)(1); *Benjamin v. Citation Shares Mgmt., LLC*, No. 12-029, 2013 WL 6385831, at \*4 (ARB Nov. 5, 2013). Indeed, other circuits have held, and we have suggested, that an objectively reasonable belief suffices even under Section 3730(h)(1)'s *first* prong. *See Hoyte*, 518 F.3d at 68–69; *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004); *Wilkins v. St. Louis Housing Auth.*, 314 F.3d 927, 933 (8th Cir. 2002); *Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002).

[3] In a *qui tam* action, a misrepresentation about compliance with a statutory, regulatory, or contractual

To summarize, Singletary can establish that she engaged in protected activity under Section 3730(h)'s second prong if she plausibly alleges facts showing that she took lawful measures to stop or avert what she reasonably believed would be a violation of the False Claims Act. *See Grant*, 912 F.3d at 201–202.

**B**

Singletary's proposed complaint sufficiently alleges protected activity under the second prong of Section 3730(h)(1).

For starters, there is no dispute that Singletary's actions protesting the overheated conditions in which the laboratory animals were kept and, ultimately, her email to the NIH, were "lawful[.]" *See* 31 U.S.C. § 3730(h)(1).

The question, then, is whether the proposed complaint sufficiently alleges that her actions were undertaken to try to prevent what she reasonably believed would be the presentation of false claims by the University. It does.

---

requirement is only actionable if it is material. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016); *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, No. 18-7123, 2019 WL 2896005, at \*4 (D.C. Cir. July 5, 2019). We need not decide whether a materiality requirement similarly applies to an employer's false claims under the whistleblower provision because the University has not argued that its alleged misrepresentations were immaterial as a matter of law. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019).

*First*, the proposed complaint alleges that, between mid-Summer 2013 and Spring 2014, Singletary repeatedly informed Obisesan "that the conditions in which the Howard laboratory animals were being held were too warm, not in compliance with NIH * * * standards, and that the ambient air temperature constituted violations of the terms and conditions under which Howard received grant money from NIH and the federal government." Proposed Complaint ¶¶ 18–19, J.A. 129. As the Attending Veterinarian charged with supervising the care of laboratory animals, Singletary knew that federal law mandated their proper care, including the maintenance of appropriate ambient air temperatures in their living quarters. *Id.* ¶¶ 17–18, J.A. 129; *see* 9 C.F.R. §§ 2.33(b)(1), 2.38(k)(1), 3.126(a); Care Standards Guide at 43. She also knew that the heightened temperatures deviated from those standards, and that the University was obligated to report the deviations to the NIH. Proposed Complaint ¶¶ 20, 22, 26, J.A. 130–132; *see* Humane Care Policy § IV.F.3; Prompt Reporting Notice at 2–3.

*Second*, Singletary had an objectively reasonable belief that the University was or would soon be submitting false certifications of its compliance with animal welfare requirements in connection with funding claims. According to Singletary, the University made annual certifications "to [the NIH] and other federal agencies that the laboratory animals in question * * * were being maintained and cared for under certain federally mandated ambient living conditions." Proposed Complaint ¶ 43, J.A. 137; *see* 7 U.S.C. § 2143(a)(7); 42 U.S.C. § 289d(b)(3)(A); 9 C.F.R. § 2.36(b)(3). And those certifications, Singletary reasonably believed, "were necessary for Howard to receive and retain the grant monies that they in fact received from the United States and retained throughout the relevant time period." Proposed Complaint ¶ 43, J.A. 137. *See generally* 7 U.S.C. § 2143(f); 42 U.S.C. § 289d(d).

Singletary's proposed complaint also indicates that her objections coincided with a reporting period. *See* Proposed Complaint ¶ 43, J.A. 137. Her assertedly protected activity occurred over a nine-month period between the Summer of 2013 and Spring 2014. Annual compliance certifications are due to the Department of Agriculture and the NIH by December 1 and January 31, respectively, and "may be synchronized[.]" Office of Laboratory Animal Welfare, NIH, Dep't of Health & Human Servs., *Institutional Animal Care and Use Committee Guidebook* 177 (2d ed. 2002) ("Guidebook"); 9 C.F.R. § 2.36(a); *Annual Report to OLAW*, Office of Laboratory Animal Welfare, NIH, https://olaw.nih.gov/resources/documents/annual-report.htm (last visited Aug. 1, 2019). So, as counsel for Howard University acknowledged at oral argument, Oral Arg. Tr. 34:15–35:6, Singletary has alleged facts supporting her objectively reasonable belief that, during the relevant time period, the University was or would be making false compliance certifications in connection with the submission of requests for federal funding. *See* 31 U.S.C. § 3729(a)(1)(B).

*Third*, Singletary's actions matched her words of protest. *See Grant*, 912 F.3d at 201–202. Singletary reported the overheated conditions time and again to Obisesan, Heinbockel, and Johnson, and "exhorted" them to take "remed[ial]" action, which would have headed off any false claim. Proposed Complaint ¶¶ 18–22, 24, 26, J.A. 129–132. Singletary also repeatedly urged them to report the temperature deviations to regulators, as required by law if funding claims are to be submitted. *See* 7 U.S.C. § 2143(a)(7); 42 U.S.C. § 289d(b)(3)(A), (C); 9 C.F.R. § 2.36(b)(3). Several months later, Singletary even tried to bring the University into at least partial compliance with the law by directly reporting to the NIH the animal deaths and the overheated conditions that caused

them.  *See* J.A. 101–102 ("[W]e have been having difficulty with receiving condition air [*sic*] in the facility.").

To be sure, Singletary's communications within Howard University and her email to the NIH did not accuse the University of fraud in terms.  But that is beside the point.  All that is necessary at this stage of the inquiry is that Singletary's proposed complaint plausibly allege an objectively reasonable factual basis for the belief that her email was an effort (i) to correct or counteract false submissions that had previously been made or (ii) to provide the NIH the information needed to enforce its animal-welfare requirements before any more funding was granted.  *See* Proposed Complaint ¶ 23, J.A. 131 ("Dr. Singletary, fully recognizing that the [Institutional Official], Dr. Obisesan, had never reported Howard's ambient air deviations to [the NIH], decided that leaving the matter solely in Dr. Obisesan's hands would not be prudent.").

The district court came to the opposite conclusion, and in doing so committed multiple errors.

*First*, the district court defined protected activity as requiring the plaintiff to have "investigat[ed] matters that reasonably could lead to a viable [False Claims Act] case." J.A. 226 (internal quotation marks omitted).  *See* J.A. 229 ("Nothing in her proposed amended complaint undermines the Court's original description of this report as a far cry from the grist of [a False Claims Act] allegation.") (formatting modified).    But that criterion only applies to Section 3730(h)(1)'s first prong.  *See Hoyte*, 518 F.3d at 66.  The plain text of Section 3730(h)(1)'s second prong omits that requirement and focuses exclusively on preventing or abating violations of law in the first place.  *See Grant*, 912 F.3d at 201; *Chorches*, 865 F.3d at 97; *Carlson*, 657 F. App'x at 171.

*Second*, the district court wrongly required Singletary to allege that her efforts were outside the scope of her responsibilities as Attending Veterinarian. *See* J.A. 226–228. That factor pertains only to Section 3730(h)(1)'s causal inquiry, which asks whether the University was on *notice* of her protected activity. *See United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004).

In short, when looked at through the proper legal lens, the proposed complaint plausibly alleges that Singletary undertook lawful acts in furtherance of her "efforts to stop 1 or more violations" of the False Claims Act. 31 U.S.C. § 3730(h)(1).[4]

**IV**

Singletary's work is not done yet. To state a claim for retaliation, her complaint must also plausibly allege (i) a qualifying retaliatory employment action, (ii) the University's knowledge that she was engaged in protected activity, and (iii) facts showing that the employment action was caused by her engagement in that activity. *See* 31 U.S.C. § 3730(h)(1) (affording "all relief necessary" to make an employee "whole" if she is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment because of" her engagement in protected activity); *Yesudian*, 153 F.3d at 736. Singletary's proposed complaint fits the bill. She adequately alleges termination of her position, the University's awareness

---

[4] Because denying leave to amend was in error under the second prong, we need not decide at this early juncture whether the proposed complaint also adequately alleges protected activity under Section 3730(h)(1)'s first prong. *See Chorches*, 865 F.3d at 97 n.31.

of her protected activity, and facts connecting her termination to that protected activity.

## A

Singletary alleges that within weeks of her email to the NIH about air-temperature problems, the University cut short her appointment by six months, ending it in December 2014 rather than June 2015. Discharge plainly qualifies as a retaliatory employment action under Section 3730(h). 31 U.S.C. § 3730(h)(1); *see United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1240 (D.C. Cir. 2012).

The University resists that conclusion by arguing that Singletary's departure was, as a matter of law, a "voluntary resignation" as opposed to a discharge. *See* University Br. 35–39. This is so, the University says, because after being informed of her pending termination, Singletary left the University in August 2014.

That argument is wrong in two respects. First, there was nothing "voluntary" about Singletary's exit. She left only *after* she was told that she was being terminated effective December 2014. Plus, the proposed complaint alleges that the University's appointments are "evergreen," meaning that, absent the discharge, Singletary would have been able to "remain[] in the position of Attending Veterinarian for a lengthy period of time beyond June * * * 2015." Proposed Complaint ¶¶ 10, 37, J.A. 127, 135.

Second, and in any event, the mere *notice* of termination is a cognizable adverse employment action regardless of whether the employer follows through. *See Schultz v. Congregation Shearith Israel of the City of N.Y.*, 867 F.3d 298, 305–306 (2d Cir. 2017) ("[N]otice of termination itself

constitutes an adverse employment action, even when the employer later rescinds the termination."); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011) (Gorsuch, J.) (listing "notice of termination with a grace period before actual firing occurs" as an "adverse employment action"). That is because wrongful discharge claims accrue, and limitation periods begin to run, at the time the employer notifies the employee that she is fired, not later on the last day of her employment. *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016); *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981); *see Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 303 (S.D.N.Y. 2014) (applying *Chardon* to hold that the limitations period for a False Claims Act retaliation claim was triggered when plaintiff was notified of his termination). So the University's retaliatory action occurred in June 2014 when Singletary was notified that she was being terminated.

**B**

Singletary's proposed complaint also rises to the task of alleging that she was discharged because of her protected activity. Specifically, the proposed complaint plausibly shows both that the University was aware of Singletary's protected activities and that those activities motivated her discharge.

**1**

Common sense teaches that an employer cannot retaliate against conduct of which it was unaware. *See Schweizer*, 677 F.3d at 1239; *cf. Williams*, 389 F.3d at 1260–1261 (Under Section 3730(h)(1)'s first prong, "[u]nless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation.") (formatting modified). So to adequately allege that she was discharged because of her protected activity,

Singletary must first allege that the University had knowledge or notice that she was engaged in protected activity. *See Yesudian*, 153 F.3d at 736. In this case, that means Singletary must allege that the University was aware she was engaging in lawful acts aimed at preventing the University's submission of false or fraudulent claims. *See United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767 (10th Cir. 2019).

Singletary's proposed complaint clears that hurdle. Singletary alleges that she repeatedly urged her superiors to rectify the animals' living conditions. In doing so, she stressed not only the medical and humanitarian need for changes, but also that the continuing failure to remedy the situation violated funding requirements. *See* Proposed Complaint ¶ 18 ("Dr. Singletary informed Dr. Obisesan * * * that the conditions in which the Howard laboratory animals were being held were too warm, not in compliance with NIH * * * standards, and that the ambient air temperature constituted violations of the terms and conditions under which Howard received grant money from NIH and the federal government."); *id.* ¶ 19 ("Dr. Singletary told [Drs. Heinbockel and Johnson] that Howard was not in compliance with the terms and conditions under which it was receiving grant money from NIH."); *id.* ¶ 21 (Dr. Singletary "told both Dr. Heinbockel and Dr. Johnson that the ambient air temperature deviations from acceptable standards constituted violations of the terms and conditions of Howard's federal grants."); *id.* ¶ 22 ("In a majority of [her] conversations [with Obisesan] she expressly noted that Howard was out of compliance with the terms and conditions under which it was receiving grant money from the federal government."), J.A. 129–131.

Singletary also urged them in advance not to submit false annual compliance certifications and to rectify pending false certifications of compliance. *See* Proposed Complaint ¶¶ 18–

19, 21 (alleging that Dr. Singletary exhorted Drs. Obisesan, Heinbockel, and Johnson to take "corrective action"); *id.* ¶ 22 (Singletary "noted that the conditions and problems that Howard was encountering with respect to ambient air temperature should be reported to [the NIH]."); *id.* ¶ 26 ("Dr. Singletary[] insist[ed] that Howard was in violation of the terms and conditions of federal grants, that the violations should be reported, and that the matter should be remediated."), J.A. 129–132.

The University objects that it nonetheless lacked notice because, in complaining, Singletary was just doing her job as Attending Veterinarian. *See, e.g.*, *Williams*, 389 F.3d at 1261 ("[P]laintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice.") (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)); *see also* Dissenting Op. at 5 (characterizing Singletary's complaints as falling "squarely within her job as an attending veterinarian").

Singletary did more than perform her ordinary caretaking duties. Her complaints also "expressly noted that Howard was out of compliance with the terms and conditions under which it was receiving grant money from the federal government," and she objected that, under the terms of the grant program, "the conditions and the problems that Howard was encountering with respect to the ambient air temperature should be reported" to the NIH. Proposed Complaint ¶ 22, J.A. 130–131; *see id.* ¶ 26, J.A. 131–132. As the University acknowledges, policing compliance with grant conditions was *not* one of Singletary's responsibilities. *See* Oral Arg. Tr. 43:19–44:20.

In addition, she went "outside the usual chain of command[.]" *Williams*, 389 F.3d at 1261. After her direct supervisor, Obisesan, proved unresponsive to her repeated complaints, Singletary went over his head to Dr. Heinbockel, the Chair of the Committee, and to Dr. Johnson, the Dean of the Medical School. Those reports were outside her professional wheelhouse.

And certainly Singletary's email to the NIH went above and beyond her assigned duties as she attempted to cut short the University's allegedly fraudulent prior certifications. *See* Proposed Complaint ¶ 24, J.A. 131 (alleging that communication with the NIH "was not within the ambit of Dr. Singletary's duties or job description"); *see id.* ¶ 24, J.A. 131 (responsibility for communicating with the NIH rested with Obisesan, the Institutional Official); Oral Arg. Tr. 24:16–23 (University's concession that Obisesan "was designated for the communication[]" with NIH). Indeed, that email was the only written communication Singletary sent to the NIH during her twenty-month tenure at the University. And if Singletary's actions were just part of her job, *see* Dissenting Op. at 5–8, there would have been no reason for Obisesan to "excoriate[]" her in front of other faculty members for being unprofessional and lacking "integrity," Proposed Complaint ¶ 26, J.A. 132.

The Humane Care Policy corroborates the proposed complaint's alleged division of responsibilities. It instructs the Committee, "through the Institutional Official," to provide the NIH with information about non-compliance with the Humane Care Policy and/or the Care Standards Guide. Humane Care Policy § IV.F.3; *see also* Prompt Reporting Notice at 1 ("The Institutional Official signing the Assurance, in concert with the [Committee], is responsible for this reporting."). So by copying Obisesan and Heinbockel on her email to the NIH, Singletary put the University on notice that she was

singlehandedly attempting to address the certification problem to which they had proven unresponsive.

The district court came to the contrary conclusion, pointing to a statement in the NIH's Guidebook—a document provided to regulated parties for "informational purposes only" (Guidebook, Inside Cover)—that the care of animals "necessitates a partnership among the Institutional Official, [the Committee], the veterinarian and the investigators," which may only be achieved "when all of the players [including] the veterinary staff" contribute to a "shared goal." J.A. 227–228 (quoting Guidebook at 19). From that, the district court inferred that "communicating with NIH" was a "normal part of the veterinarian's job." J.A. 228.

That was error. At this procedural stage, all reasonable inferences from the proposed complaint's factual allegations must be drawn in support of, not against, Singletary. *See Interbank Funding*, 629 F.3d at 216 (plaintiff seeking leave to amend is entitled to the benefit of "all inferences that can be derived from the facts alleged") (formatting modified). Because the Guidebook's description of the Attending Veterinarian's role is fully consistent with Singletary's allegations about Obisesan's sole responsibility for reporting to the NIH, the district court crossed the line into adverse factfinding.

For its part, the Dissenting Opinion's central objection is that Howard University officials could have viewed Singletary's complaints as just "'grumbling'" about "regulatory compliance," not as "efforts to prevent fraud against the government." Dissenting Op. at 6–7, 8 (quoting *Yesudian*, 153 F.3d at 743). Maybe. But the question at the pleading stage is not whether the facts could be read differently than the plaintiff does. Instead, we must take all reasonable

inferences in favor of Singletary. *See Ashcroft*, 556 U.S. at 678. The complaint need not conclusively foreclose any alternative reading. Given Singletary's repeated statements to higher-ups that the animals' housing conditions not only endangered their welfare, but also violated the promises made (and being made) to obtain federal funding, it is at least an equally reasonable inference that Howard University knew that she was concerned about putting a stop to misrepresentations and material omissions in the University's grant filings with the government.

Singletary also went far beyond grumbling about regulatory violations. Howard University made certifications to the NIH that "were necessary for Howard to receive and retain" federal grant money. Proposed Complaint ¶ 43, J.A. 137. Singletary repeatedly complained to her supervisors that, as a consequence of the regulatory violations, the University also was not complying with conditions included in those certifications. And she urged them to report the problems to the NIH, rather than assert a fictional compliance. When her complaints went unaddressed, Singletary took the unprecedented step of reaching out directly to the NIH.

Finally, the Dissenting Opinion tries to reduce Singletary's repeated calls for Howard University to take corrective actions in its representations to the government as just seeking to fix the animals' living conditions. Dissenting Op. at 8–9. Not so. Obisesan criticized Singletary for "insist[ing]" both that (i) Howard University's "violations should be reported" to the NIH per the grant's requirements, (ii) "and that the matter should be remediated." Proposed Complaint ¶ 26, J.A. 132.

**2**

Lastly, the proposed complaint adequately alleges—and the University does not dispute—that as a matter of law Singletary's discharge was "motivated, at least in part," by her protected activity. *Yesudian*, 153 F.3d at 736. After all, her discharge followed shortly on the heels of Obisesan excoriating her for communicating with the NIH about the laboratory's climate-control problems and their fatal consequences. *See* Proposed Complaint ¶¶ 26, 28, J.A. 131–132. And that dressing down itself came just a few weeks after Singletary's communication with the NIH. *Id.* ¶¶ 24, 26, J.A. 131–132; *see Williams*, 389 F.3d at 1262 ("By claiming that his suspension and termination occurred just after he disclosed * * * to his superior" that he had alerted the government to possible False Claims Act violations, "Williams has satisfactorily alleged that his protected activity caused Martin-Baker's retaliation."); *see also Harrington v. Aggregate Indus. Northeast Region, Inc.*, 668 F.3d 25, 32 (1st Cir. 2012) ("To clear the low bar required to establish a prima facie case, the fact that [defendant] learned of the [plaintiff's] whistleblowing several months before his firing suffices[.]").

The district court also suggested that, even assuming Singletary's allegations were sufficient, the proposed complaint might still fall short of Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud claims. *See* FED. R. CIV. P. 9(b) (plaintiffs alleging fraud "must state with particularity the circumstances constituting fraud or mistake"). That is incorrect. Rule 9(b) applies to False Claims Act *qui tam* actions. But it does not extend to retaliation claims because such claims do not themselves assert or seek to prove actual fraud. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010); *Williams*, 389 F.3d

at 1256, 1259; *see also* Oral Arg. Tr. 23:3–5 (University's acknowledgement that Rule 9(b) is inapplicable).

**V**

Singletary's proposed complaint states a claim for retaliation under the False Claims Act. Granting leave to amend, therefore, would not have been futile. The district court committed reversible error in concluding otherwise. For that reason, the district court's judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered*.

KATSAS, *Circuit Judge*, dissenting: Dr. Sylvia Singletary alleges that Howard University retaliated against her for trying to stop violations of the False Claims Act. To make out that claim, Singletary must plead and ultimately prove that the University, when it fired her, knew that she was trying to stop FCA violations. But the activities that allegedly caused the firing—Singletary's repeated complaints that laboratory animals were housed in overly warm conditions—did not involve allegations of fraud and fell squarely within her job duties as an attending veterinarian. The proposed second amended complaint thus does not support a plausible inference that the University knew Singletary was trying to stop FCA violations. Accordingly, I would affirm the dismissal of this case and denial of leave to amend.

I

The False Claims Act prohibits knowingly presenting to the federal government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). Either the Attorney General, *id.* § 3730(a), or private individuals, *id.* § 3730(b), may sue for violations. The FCA also makes it unlawful for an employer to discriminate against an employee "because of lawful acts done by the employee … in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." *Id.* § 3730(h)(1). This text creates two distinct intent elements: the *employee* must act to further an FCA action or stop an FCA violation, and the *employer* must discriminate because the employee is so acting. To form the prohibited retaliatory intent, the employer therefore must know something about the employee's intent—that she was acting to further an FCA action or stop an FCA violation. *See United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1260–61 (D.C. Cir. 2004); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998).

These cases analyzed an earlier version of section 3730(h)(1), which prohibited retaliation only for acts "in furtherance of an action" under the FCA. Construing that provision, we held that an employer cannot possess the necessary retaliatory intent "unless it is aware that the employee is investigating fraud." *Schweizer*, 677 F.3d at 1238 (quotation marks omitted). Moreover, an employee's "grumbling to the employer about job dissatisfaction or regulatory violations" does not provide the requisite notice. *Yesudian*, 153 F.3d at 743. Furthermore, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice." *Williams*, 389 F.3d at 1261 (quotation marks omitted).

Our cases indicate what kind of conduct provides such notice. The employee in *Yesudian*, acting outside his normal job responsibilities, told superiors that a colleague "had falsified time and attendance records, accepted bribes from vendors, permitted payments to vendors who did not provide services, and taken University property home for personal use." 153 F.3d at 743. The employee in *Williams*, who we assumed was acting outside his normal job responsibilities as a contract negotiator, told "the government—the opposing negotiating party—to continue challenging the pricing data underlying his employer's contract." 389 F.3d at 1262. The employee in *Schweizer*, acting outside her normal chain of command, "alleged a variety of specific False Claims Act violations" to superiors in her company. 677 F.3d at 1239–40. In each case, the employee's activity provided clear notice to the employer of a concern about fraud on the government.

At the same time, we approved a line of cases indicating what kind of conduct does *not* provide an employer with notice

of a fraud-related concern. Those cases featured two distinct "problems"—the employee "made no allegations of fraud," or the protected conduct "was part of his job." *Yesudian*, 153 F.3d at 744; *see Williams*, 389 F.3d at 1261. For example, the Fifth Circuit affirmed summary judgment against an employee who had complained to superiors about unsubstantiated charges to the government, but "never characterized his concerns as involving illegal, unlawful, or false-claims investigations." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994). The Ninth Circuit ordered judgment as a matter of law against a special education teacher who complained to superiors about alleged regulatory violations under the Individuals with Disabilities Education Act. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268–70 (9th Cir. 1996). And the Tenth Circuit affirmed the dismissal of a claim by an employee who, as part of her job, reported widespread violations of Medicaid regulations to her superiors. *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522–23 (10th Cir. 1996).

In 2009, Congress broadened section 3730(h) to prohibit retaliation "because of" conduct "in furtherance of … efforts to stop" FCA violations. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(d), 123 Stat. 1617, 1625. That amendment preserved the key words "because of," which require an employer to know that "the employee was engaged in protected activity." *See Yesudian*, 153 F.3d at 736. As the Tenth Circuit explained, "[o]nce Congress expanded the scope of protected activity, the universe of conduct that a plaintiff could allege to show notice also necessarily expanded." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 766 (10th Cir. 2019). Or as we had previously explained, "the kind of knowledge the [employer] must have mirrors the kind of activity in which the plaintiff must be engaged." *Yesudian*, 153 F.3d at 742. Post-amendment, this means that an employer

must know that its employee either tried to further an FCA action or "tried to stop its alleged [FCA] violations." *Reed*, 923 F.3d at 766.

Other circuits have continued to recognize *Yesudian*'s core insight that employers are unlikely to have the requisite notice if the employee "made no allegations of fraud" or the protected conduct was "part of his job." 153 F.3d at 744. In *United States ex rel. Strubbe v. Crawford County Memorial Hospital*, 915 F.3d 1158 (8th Cir. 2019), the Eighth Circuit affirmed the dismissal of claims brought by hospital employees who complained that the hospital had violated Medicare payment requirements, but not that the hospital's "behavior was fraudulent or potentially subjected it to FCA liability." *Id.* at 1168. The court reasoned that the complaints were not sufficiently connected to "fraudulent" activity to support a plausible inference of employer knowledge. *Id.* This approach still makes good sense, for "efforts to stop" FCA violations, like efforts "in furtherance of" an FCA action, share the same underlying concern about fraud against the government. In *Reed*, the Tenth Circuit affirmed the dismissal of a retaliation claim after concluding that the alleged protected conduct involved the plaintiff's ordinary job responsibilities. *See* 923 F.3d at 767–71. This too still makes sense: employers are unlikely to know that ordinary job activities are "efforts to stop" FCA violations, just as they are unlikely to know that those activities are "in furtherance of" an FCA action.

In sum, the amended version of section 3730(h) requires an employee to prove that her employer was "on notice that she had tried to stop its alleged False Claims Act violations." *Reed*, 923 F.3d at 766. And an employer is unlikely be on notice when an employee does not raise concerns about fraud or simply does her job. *Yesudian*, 153 F.3d at 744. On a motion to dismiss, the question is whether the employee has "pleaded

5

facts that plausibly show" such notice. *Reed*, 923 F.3d at 766; *see Ashcroft v. Iqbal*, 556 U.S. 662, 667–84 (2009).

II

Singletary fails to state an FCA retaliation claim under these governing standards. She alleges two categories of protected activity—repeated complaints to superiors that the University was housing laboratory animals in excessively warm conditions, and one external email reporting the death of nearly two dozen laboratory mice. Charitably construing the proposed complaint, I am willing to credit Singletary's allegations regarding her own intent—*i.e.*, that she undertook these activities in part to stop fraud against the government, rather than simply to improve the treatment of animals under her care or to bring the University into compliance with animal-care regulations. But Singletary does not claim to have raised fraud concerns with the University, and her activities fell squarely within her job as an attending veterinarian. The allegations thus do not support a plausible inference that the University *knew* Singletary was trying to stop FCA violations.

Singletary's alleged complaints within the University addressed four related topics. *First*, she voiced concerns that "ambient air temperature" was too high for laboratory animals. *E.g.*, Proposed Second Amended Complaint ("Compl.") ¶ 18, J.A. 129. Doing so fell squarely within Singletary's job duty, set forth in the offer letter attached to her proposed complaint, to "promot[e] … animal care, health and welfare including but not limited to proper animal quarters." J.A. 165. It is hardly surprising that Singletary—a veterinarian—raised this concern, which would not have suggested that she was seeking to stop fraud against the government.

*Second*, Singletary complained that the University, by not maintaining proper air temperatures, was violating regulations

6

promulgated under the Animal Welfare Act and the Health Research Extension Act. *E.g.*, Compl. ¶¶ 12–13, 18, J.A. 127–29; *see* 9 C.F.R. § 3.126(a). Again, this fell well within her contractual duty to promote appropriate animal care. Moreover, Singletary alleges that she was an "Attending Veterinarian" as defined in the regulations. Compl. ¶ 16, J.A. 128. That position required Singletary "to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use," 9 C.F.R. § 2.33(a)(2), in part by providing "appropriate facilities, personnel, equipment, and services," *id.* § 2.33(b)(1). Singletary's job thus required her to ensure that laboratory animals were housed in permissible temperature ranges. Her pressing the University about "regulatory violations" in this area would hardly have suggested anti-fraud efforts. *Yesudian*, 153 F.3d at 743.

*Third*, Singletary protested that the University "was out of compliance with the terms and conditions under which it was receiving grant money from the federal government." *E.g.*, Compl. ¶ 22, J.A. 130–31. But under the terms of her employment contract, Singletary was required to act "as a consultant for grants … requiring [her] expertise." J.A. 165. The grant conditions at issue involved satisfying the regulatory requirements regarding ambient air temperature. Singletary's proposed complaint repeatedly equates the two. *E.g.*, Compl. ¶ 18, J.A. 129 ("the ambient air temperature constituted violations of the terms and conditions under which Howard received grant money"); *id.* ¶ 21, J.A. 130 ("the ambient air temperature deviations from acceptable standards constituted violations of the terms and conditions of Howard's federal grants"). The Health Research Extension Act similarly requires "assurances" that grantees will satisfy animal-care rules promulgated by the National Institutes of Health. 42 U.S.C. § 289d(c)(1). In context, Singletary's concerns about grant compliance equate to her concerns about regulatory

compliance. And raising those concerns fell within her duties as a grant consultant and an architect of the University's animal-care compliance programs.

*Fourth*, Singletary advised superiors that "the problems that Howard was encountering with respect to the ambient air temperature should be reported." Compl. ¶ 22, J.A. 131. This was another facet of her job duties. As the Attending Veterinarian, Singletary was required to serve on the University's Institutional Animal Care and Use Committee (IACUC). Compl. ¶¶ 15–16, J.A. 128; *see* 9 C.F.R. § 2.31(b)(3). By law, that Committee was required to report certain violations of the Animal Welfare Act to the University and the Department of Agriculture, 7 U.S.C. § 2143(b)(4)(A), (C), and to report to NIH any violations of its animal-care regulations, 42 U.S.C. § 289d(b)(3)(C). And as a member of the Committee, Singletary herself was required to report any dissenting views. 7 U.S.C. § 2143(b)(4)(A)(iii); 42 U.S.C. § 289d(b)(3)(C). Moreover, these obligations arose under animal-welfare laws, so complaining about "regulatory violations" in this area would not have signaled efforts to prevent fraud against the government. *See Yesudian*, 153 F.3d at 743.

In sum, Singletary's claim suffers from the same "problems" noted in *Yesudian*: she never told the University that she was "concerned about possible fraud," and her actions were "part of [her] job." 153 F.3d at 744. Treating animals inhumanely, violating NIH regulations and grant conditions, and failing to report the violations may be improper, but they do not amount to fraud. And complaints on these matters would have indicated only that Singletary was performing her contractual and regulatory duties as an Attending Veterinarian. To be sure, violations of regulations or grant conditions may become violations of the False Claims Act, but only if a grantee

makes false or misleading representations to receive money from the government. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999–2001 (2016). And no case suggests that complaints about regulatory violations give notice of further, unexpressed anti-fraud concerns. To the contrary, *Yesudian* and its progeny make clear that "[m]erely grumbling" about "regulatory violations" does not give such notice. 153 F.3d at 743.

My colleagues read the proposed complaint to allege that Singletary urged her superiors "not to submit false annual compliance certifications and to rectify pending false certifications of compliance." *Ante* at 22. Likewise, they say that Singletary urged the University not to "assert a fictional compliance" with grant conditions. *Ante* at 26. Such allegations might well establish the requisite notice, but the proposed complaint does not make them. In support of their reading of the proposed complaint, my colleagues note that Singletary urged the University to take "corrective action." Compl. ¶¶ 18–19, 21, J.A. 129–30. True enough, but the "corrective action" involved *lowering air temperatures*. It had nothing to do with avoiding or correcting false certifications—a different concern that Singletary never claims to have raised.[1]

---

[1] *See* Compl. ¶ 18, J.A. 129 ("Dr. Singletary informed Dr. Obisesan … that the conditions in which the Howard laboratory animals were being held were too warm, not in compliance with NIH/OLAW standards, and that the ambient air temperature constituted violations of the terms and conditions under which Howard received grant money from NIH and the federal government. On virtually every one of these occasions, Dr. Singletary exhorted Dr. Obisesan to initiate corrective action."); *id.* ¶ 19, J.A. 129–30 ("Dr. Singletary had numerous discussions with Dr. Obisesan in which she expressed these concerns that the laboratory animals' living area was too hot. When, after several conversations with Dr.

9

Indeed, far from even hinting that Singletary conveyed any fraud-related concern, the proposed complaint states that "[t]he issue of poor air quality for laboratory animals was the sole source of tension between Dr. Singletary and her superiors." Compl. ¶ 27, J.A. 132. After performing their own independent research into compliance certifications, about which the complaint is silent, my colleagues posit that Singletary's objections "coincided with a reporting period." *Ante* at 17. Perhaps so, but that bears at most on whether Singletary had the requisite intent to stop FCA violations. The proposed complaint nowhere suggests that Singletary communicated to the University any concerns about false certifications, which is what matters for notice.

My colleagues further reason that Singletary complained not only to her immediate supervisor, Dr. Thomas Obisesan, but also to Dr. Thomas Heinbockel, the chairman of her animal-care committee, and Dr. Mark Johnson, the dean of the medical school. *Ante* at 24. We have recognized that when an employee "alerts a party outside the usual chain of command, such action *may* suffice to notify the employer that the employee is engaging in protected activity." *Williams*, 389

---

Obisesan in which she informed him of Howard's non-compliance and sought corrective action, Dr. Obisesan did not act on Dr. Singletary's concerns, she made the same complaints to Dr. Heinbockel and Dr. Mark Johnson …. Dr. Singletary told them that Howard was not in compliance with the terms and conditions under which it was receiving grant money from NIH. Dr. Singletary also made her concerns known to these men in IACUC meetings. As with Dr. Obisesan, she requested that corrective action be taken. No corrective action was taken."); *id.* ¶ 21, J.A. 130 ("As noted above, she told both Dr. Heinbockel and Dr. Johnson that the ambient air temperature deviations from acceptable standards constituted violations of the terms and conditions of Howard's federal grants. She urged corrective action.").

F.3d at 1261 (emphasis added); *see also Reed*, 923 F.3d at 769. But the ultimate question remains one of the employer's notice of protected activity, and we have never held that *any* action outside the normal chain of command, no matter how unrelated to fraud prevention, puts the employer on notice. To the contrary, we have held that an employee's breaking the chain of command helps prove notice only where the employee's activity itself warns of fraud. *See Schweizer*, 677 F.3d at 1239–40 (employee "alleged a variety of specific False Claims Act violations"); *Williams*, 389 F.3d at 1262 (negotiator told "the government—the opposing negotiating party—to continue challenging the pricing data underlying his employer's contract"). Singletary did no such thing. By her own reckoning, she made "the same complaints" to Heinbockel and Johnson that she made to Obisesan. Compl. ¶ 19, J.A. 129. Because those complaints involved animal-treatment issues as opposed to fraud issues, the mere fact that Singletary conveyed them to higher-ups does not advance her retaliation claim.

The same is true of Singletary's single email to NIH. The body of that email states:

> At 10:45 am, April 15, 2014, I found 21 mice dead from heat exhaustion. Room number [redacted] which houses animals on [an individually ventilated cage] lost power over night. In addition, we have been having difficulty with receiving conditioned air in the facility. A more detailed report will be submitted after I have briefed the IACUC and [Dr. Obisesan].

J.A. 102 (cleaned up). My colleagues recognize that this email "did not accuse the University of fraud in terms." *Ante* at 18. Far from it. The email reported to regulators that mice died when an air conditioner failed, noted an ongoing problem with air conditioning, and promised more details to follow. Nothing

in it would have alerted the University that Singletary was seeking to stop fraud against the government. My colleagues disagree with the district court about whether Singletary broke protocol by sending this email herself, rather than urging Obisesan to do so. *Ante* at 24–25. But because the email had nothing to do with stopping fraud against the government, that dispute is immaterial to the question whether the email provided the University with the requisite notice.

\* \* \* \*

Singletary's proposed second amended complaint does not allege facts supporting a plausible inference that the University knew she was engaged in efforts to stop FCA violations. Therefore, I would affirm the dismissal of this case and the denial of her motion to amend as futile.