# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1373
_____

Richard Sherman

*Plaintiff - Appellant*

v.

Berkadia Commercial Mortgage LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 16, 2020
Filed: April 14, 2020

_____

Before COLLOTON, SHEPHERD, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Richard Sherman alleges he was terminated from his employment by Berkadia Commercial Mortgage LLC ("Berkadia") in retaliation for actions protected by the

False Claims Act ("FCA") and Missouri law.  The district court[1] granted Berkadia summary judgment on all claims.  Sherman appeals.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. Background

Berkadia is a commercial real estate lender that specializes in mortgage loans to developers of multifamily housing.  Many Berkadia loans are insured by the Federal Housing Administration.  If a developer defaults on an insured loan, Berkadia may assign the mortgage to the United States Department of Housing and Urban Development ("HUD") and recoup the unpaid balance.  In order to obtain this insurance, Berkadia's mortgages must comply with HUD regulations.  Berkadia has an underwriting department that is responsible for ensuring the company's loans comply with HUD regulations.  Berkadia also has a production department which develops and originates the loan applications.  Once the underwriters are done with their work on a mortgage application, it is sent to HUD for its approval.

In 2011 one of Berkadia's offices was accused by HUD of "pushing the limits" of acceptable conduct under HUD regulations.  At least partially in response to these complaints, Berkadia hired Sherman as an underwriter.  Berkadia hoped that Sherman's presence would help to repair the company's frayed relationship with federal regulators.  At the time of his hire Sherman had an excellent reputation for compliance and an unusually good relationship with HUD.  By 2013 Sherman had become a senior vice president and the chief underwriter of Berkadia's HUD group.  This put him in charge of a team of underwriters who reviewed mortgages for adherence to HUD regulations and company rules prior to their submission to HUD.

---

[1]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri.

Sherman successfully reduced the HUD rejection rate on loans Berkadia submitted. He also urged greater transparency with HUD, and recommended that Berkadia notify HUD when it discovered a discrepancy between the company's practices and HUD regulations. In one instance, Sherman voiced a concern about how Berkadia had handled a loan to a developer of an apartment complex in North Carolina called the Calabash Project. Berkadia had issued the mortgage in 2010, prior to the start of Sherman's employment at Berkadia. In 2012 the developer defaulted on the loan, and in 2013 a lawsuit was brought by a construction contractor against Berkadia. An issue that arose in the suit was why certain fees accompanying the loan were not disclosed to HUD at the time of submission. Berkadia's internal investigation of the matter found that one of its staff may have knowingly allowed the company to submit the loan to HUD without disclosing the fees. After reviewing the results of the investigation, Sherman advised Berkadia's then-president to disclose what Sherman considered to be a violation of HUD rules. But Berkadia, having initially assigned the failed mortgage to HUD, ultimately decided to end the matter by repurchasing the loan and absorbing the attendant loss.

Another example of Sherman's push for greater transparency occurred in 2015, when Sherman raised concerns about Berkadia's handling of a loan related to a California apartment complex known internally as the Rancho Project. The original mortgage Berkadia submitted, which HUD approved, failed to include an increase the developer had requested to a bridge loan. Once Sherman realized that Berkadia's submission was inaccurate, he notified HUD of the increase, and HUD reapproved the loan. Despite this resolution, and emails showing that Sherman had received information about the bridge loan's increase prior to the original submission, Sherman told Berkadia's Executive Committee that he believed his direct supervisor, Phil Long, deliberately hid the increase from him to boost the chances that HUD would accept the loan.

Sherman's focus on HUD compliance sometimes created tension between Berkadia's production and underwriting teams. The production team complained about Sherman's withholding of approval based on what they perceived to be trivial glitches in the origination process. One particular point of contention involved HUD's "bright-line rule," which is a guideline that prohibits mortgage originators from unduly influencing those who underwrite those mortgages. Sherman believed that the production team occasionally attempted to improperly influence his underwriting staff. Sherman contacted Long several times about potential bright-line-rule violations. Long, for the most part, was receptive to Sherman's concerns. However, on at least one occasion, he accused Sherman of nitpicking and dismissed what he perceived to be excessive worry. Long also rejected a question regarding the bright-line rule that Sherman requested be added to the internal survey Berkadia employees completed after each loan submission.

There were others at Berkadia who expressed concern that Sherman had adopted an excessively strict interpretation of HUD regulations and was prone to overreaction when the company did not endorse his interpretation. Berkadia's production manager was among those who chafed under Sherman's regulatory views. Eventually the relationship between Sherman and the production manager became so toxic that Long hired an outside consultant to assess and attempt to mediate the relationship. After interviewing thirty-five Berkadia employees, the consultant reported that while both Sherman and the production manager had room to improve their respective job performance, the production team was able to maintain a high level of productivity despite the manager's weaknesses. Sherman's underwriting team, however, was underperforming, taking twice as long as the industry average to process loan applications. The consultant attempted a number of strategies designed to assist the two managers to work more efficiently together, but eventually conceded that Sherman was "not driving the positive change he should be in the underwriting group" and that he "c[a]me across as a leader who hates collaboration and wants everyone . . . out of [his] hair."

In May 2016 Sherman emailed Long, stating that it was "impossible" for him to collaborate with the production manager. In a second email Sherman issued what seemed to be an ultimatum, telling Long that if the production manager was "envisioned to have a prominent management role in Berkadia's vision for 2020 (or even 2016), you should tee up the next Organizational Change Announcement with my name." Sherman noted around the same time period that he "couldn't care less" about what the production manager thought of him. He also admitted that his relationship with Long was "in a bad place."

Sherman was terminated on October 13, 2016. In response to Sherman's written request for the reasons for termination, Long stated the decision was performance based. In particular, Long noted Sherman's unwillingness to collaborate with other high-level managers, his habit of magnifying conflict, and his inability to develop an underwriting team that met Berkadia's expectations. Sherman asserts that when Long initially informed him of his termination, Long stated that Sherman had not "do[ne] [himself] any favors by going to the Executive Committee" regarding the Rancho bridge loan.

Sherman filed this suit on July 31, 2017, alleging retaliation under the FCA and wrongful termination under Missouri law. He also brought a claim sounding in quasi-contract. The district court granted Berkadia summary judgment on all claims. On appeal, Sherman abandons his quasi-contractual claim, arguing error only as to the court's rulings on his FCA retaliation and wrongful-termination claims.

## II. Discussion

We review a grant of summary judgment *de novo*. Garrison v. Dolgencorp, LLC, 939 F.3d 937, 940–41 (8th Cir. 2019). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment

as a matter of law." <u>Spangler v. Fed. Home Loan Bank of Des Moines</u>, 278 F.3d 847, 850 (8th Cir. 2002).

### A. FCA Retaliation

The FCA "imposes liability on '[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval.'" <u>United States ex rel. Costner v. United States</u>, 317 F.3d 883, 886 (8th Cir. 2003) (quoting 31 U.S.C. § 3729(a)). The statute also contains an anti-retaliation provision, which prohibits an employer from terminating or otherwise retaliating against an employee for "lawful acts done by the employee . . . in furtherance of [a civil action for false claims] or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1); <u>see also</u> <u>Schuhardt v. Wash. Univ.</u>, 390 F.3d 563, 566–67 (8th Cir. 2004). In order to qualify as protected activity under the FCA's anti-retaliation provision, the employee's conduct: (1) "must have been in furtherance of an FCA action," and (2) "must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action, meaning the employee in good faith believes, and . . . a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." <u>Schell v. Bluebird Media, LLC</u>, 787 F.3d 1179, 1187 (8th Cir. 2015) (internal quotation marks omitted).

In order to avoid summary judgment on his FCA retaliation claim, Sherman must provide either direct evidence of retaliation, or he must create an inference of retaliation under the <u>McDonnell Douglas</u> burden-shifting framework. <u>See</u> <u>Hutton v. Maynard</u>, 812 F.3d 679, 683 (8th Cir. 2016). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct." <u>Young-Losee v. Graphic Packaging Int'l, Inc.</u>, 631 F.3d 909, 912 (8th Cir. 2011). The "direct" in

"direct evidence" denotes "the causal strength of the proof, not whether it is 'circumstantial' evidence." Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011). If direct evidence of retaliation exists, there is no need to resort to a McDonnell Douglas analysis, and summary judgment must be denied. Id.

Sherman contends that he has direct evidence of retaliation. As an example, he cites Long's comment about "going to the Executive Committee," a reference to Sherman's assertion that he had been kept out of the loop on the Rancho Project. While this may be direct evidence that Long was unhappy with Sherman's decision to circumvent the chain of command, circumventing the chain of command is not protected conduct under the FCA. This is, therefore, not the kind of direct evidence Sherman needs to survive summary judgment in this case. Nor is his other purported direct evidence, consisting of statements by Long and others expressing their disagreement with Sherman's interpretation of HUD regulations. These statements were made months before Sherman was fired and represent the kind of "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process" that do not amount to direct evidence of retaliation. Lors v. Dean, 746 F.3d 857, 866 (8th Cir. 2014) (quotation marks omitted).

When there is insufficient direct evidence of retaliation, we use the McDonnell Douglas framework to judge the viability of FCA retaliation claims, the first step of which requires Sherman to establish a prima facie case. United States ex rel. Strubbe v. Crawford Cty. Mem'l Hosp., 915 F.3d 1158, 1168 (8th Cir. 2019). In order to establish a prima facie case of FCA retaliation, Sherman must show "(1) [he] engaged in protected conduct, (2) [Berkadia] knew [he] engaged in protected conduct, (3) [Berkadia] retaliated against [him], and (4) the retaliation was motivated solely by [Sherman's] protected activity." Id. (quotation marks omitted). If Sherman establishes a prima facie case, the burden shifts to Berkadia to "articulate a legitimate reason for the adverse action." Id. (quotation marks omitted). Sherman must then

show that the reason offered was a mere pretext and that, in fact, retaliatory animus motivated the action.  Id.

The "motivated solely by" causal link required as part of the prima facie case of a FCA retaliation claim is tighter than that required in other types of retaliation and discrimination claims where we use the same McDonnell Douglas framework.  See, e.g., Pye v. Nu Aire, Inc., 641 F.3d 1011, 1021 (8th Cir. 2011) (noting that a Title VII retaliation plaintiff must show as part of his prima facie case that "the adverse action was causally linked to the protected conduct"); Kneibert v. Thomson Newspapers, Mich. Inc., 129 F.3d 444, 454 (8th Cir. 1997) ("The [ADEA retaliation plaintiff] need only show that the retaliatory motive was 'a contributing factor' as opposed to the sole reason for the adverse employment action." (quoting Wiehoff v. GTE Directories Corp., 61 F.3d 588, 598 (8th Cir. 1995)); Danzl v. N. St. Paul-Maplewood-Oakdale Indep. Sch. Dist. No. 622, 706 F.2d 813, 816 (8th Cir. 1983) (noting that a Title VII sex-discrimination plaintiff "need not prove that her sex was the sole reason for the challenged employment decision, but need only prove that sex was a factor in the decision").

The record developed below fails to create a genuine issue of material fact as to the existence of this tight causal link.  While Sherman has produced evidence that Berkadia management did not implement, and were at times critical of, some of his suggestions regarding compliance with HUD regulations, there is also evidence that Sherman's supervisors disapproved of other parts of his job performance.  The record demonstrates, for example, that Berkadia was concerned about Sherman's inability to work with the production team manager and his history of accommodating underwriters who continually produced work product at a much slower rate than the industry average.  Taken in the light most favorable to Sherman, this evidence would not allow a reasonable jury to find that Berkadia fired Sherman solely for protected activity.  In other words, Sherman "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Summary judgment was appropriate as to his FCA retaliation claim. <u>See</u> <u>United States ex rel. Strubbe</u>, 915 F.3d at 1169 (affirming summary judgment on FCA retaliation claim, at least in part because plaintiff "cannot prove that her termination was solely motivated by protected activity").

## B. *Wrongful Discharge*

Under Missouri law there is a "very narrowly drawn" public-policy exception to at-will employment that allows a terminated employee to bring a wrongful-discharge claim. <u>Margiotta v. Christian Hosp. Ne. Nw.</u>, 315 S.W.3d 342, 346 (Mo. 2010) (en banc). These claims exist only when the employee is terminated "(1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities." <u>Fleshner v. Pepose Vision Inst., P.C.</u>, 304 S.W.3d 81, 92 (Mo. 2010) (en banc).

Sherman dedicates just two paragraphs in his opening brief spanning over sixty pages to his wrongful-discharge claim under Missouri law. After stating the elements of the claim, he concludes that "[t]he same arguments" he made as to his FCA retaliation claim "support the reversal of summary judgment on the wrongful discharge claim." Sherman's attempt at inclusion-by-reference briefing fails: An FCA retaliation claim is based in federal statute, while a Missouri wrongful-discharge claim is a common-law tort. The two claims have very different elements requiring different analyses. In order to prove a wrongful-discharge claim based on his alleged whistleblowing, Sherman had to show, among other things, that "he reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of . . . *well established* and *clearly mandated* public policy." <u>Margiotta</u>, 315 S.W.3d at 347 (quoting <u>Lynch v. Blanke Baer & Bowey Krimbo, Inc.</u>, 901 S.W.2d

147, 150 (Mo. Ct. App. 1995)). "The pertinent inquiry here is whether the authority clearly prohibits the conduct at issue in the action." Id. Without meaningful argument specific to wrongful discharge, Sherman has waived review of this claim. See White v. Jackson, 865 F.3d 1064, 1075 (8th Cir. 2017) ("Because [appellant] has not presented any 'meaningful argument' in his opening brief regarding his state law claims . . . he has waived review of the district court's decision on those claims.").

Even assuming his wrongful-discharge claim was not waived, none of the HUD compliance issues Sherman raised internally during his tenure amount to "*serious misconduct*" on the part of Berkadia or its employees. See Margiotta, 315 S.W.3d at 347 (quotation marks omitted). The evidence shows that Sherman made it his mission to align the company's conduct with his interpretation of HUD regulations. Sherman's efforts in this regard were mostly well-taken by his supervisors. But on several occasions (whether the fallout from the failed Calabash Project, the increase of the bridge loan on the Rancho Project, or the bright-line-rule policies Sherman proposed) his colleagues disagreed either with his interpretation of HUD regulations or the course of action he thought the company should take to remedy a possible violation of those regulations. At no point has Sherman shown how Berkadia's activity violated "*clearly mandated* public policy." Id. The record therefore does not present a genuine issue of material fact as to whether Sherman fit Missouri's "very narrow[]" exception to at-will employment. Id. at 346. Summary judgment was appropriate on Sherman's wrongful-termination claim.

## III. Conclusion

We affirm the judgment of the district court.

_____